JOHN G. LONSDALE and JAMES M. KURN, Trustees of the St. Louis-San Francisco Railway Company, Plaintiffs, *v.* JAMES SPEYER and Others, Defendants.*

Supreme Court, Special Term, New York County, October 13, 1938.

---

* Affd., 259 App. Div. 802.

*Wollman & Wollman [Mortimer Hays, Frank A. Thompson, Edward S. Seidman, Robert G. Starr, Ivan H. Light, Charles E. Rhodes, John M. Holmes* and *Abraham Porter* of counsel], for the plaintiffs.

*Cadwalader, Wickersham & Taft [Henry W. Taft, Ralph Wolf, Wolfgang S. Schwabacher, G. Forrest Butterworth* and *Maurice Ravage* of counsel], for the defendants James Speyer and others.

*Sullivan & Cromwell [Joseph M. Proskauer, Alvin Van Bergh, Alfred Jaretzki, Jr., Walter C. Lundgren* and *William Piel, Jr.,* of counsel], for the defendants John F. Strauss, Jr., and others.

*W. Morten Carden,* for the defendant Edward N. Brown.

VALENTE, J.   In this action, the plaintiffs, as trustees of the St. Louis-San Francisco Railway Company, appointed under section 77 of the Bankruptcy Act (U. S. Code, tit. 11, § 205), seek to rescind the sale of 183,333 shares of common stock of the Chicago, Rock Island and Pacific Railroad Company made to the St. Louis-San

Francisco Railway Company in January, 1926, by the defendants then composing the firm of Speyer & Co. and the defendants then composing the firm of J. & W. Seligman & Co. E. N. Brown, who was at that time chairman of the board of directors of the St. Louis-San Francisco Railway Company, is also named as a defendant in this action. For convenience St. Louis-San Francisco Railway Company will be referred to as " Frisco;" Chicago, Rock Island and Pacific Railroad Company as " Rock Island;" Speyer & Co. as " Speyer;" and J. & W. Seligman & Co. as " Seligman." Plaintiffs seek, on the basis of a rescission, to recover the purchase price of $10,506,090.40 paid by Frisco for the Rock Island stock and an accounting by the defendants of all profits and gains growing out of the transaction.

The purchase by Frisco of the Rock Island stock was formally closed on February 5, 1926. The transaction was approved by the executive committee and by the board of directors of Frisco. The effect to be given to this approval is in issue in this case. A full consideration of the transaction in suit requires some understanding of the background then existing. This was fully presented at the trial and the more pertinent facts should be briefly stated.

Frisco was reorganized under a plan and agreement of reorganization dated as of November 1, 1916, which provided for a voting trust of the stock, with seven voting trustees who were specifically named. They represented different groups which had been active in the reorganization. The reorganized company was fully formed, elected officers, and began to function in 1916. In 1918, during the war, the Federal government took over the operation of Frisco and other railroads. In 1920 Frisco emerged from government control and resumed the management of its properties, with Kurn as its president. In 1921 the voting trust of the stock which had been created under the reorganization plan and agreement expired and the control of Frisco for the first time passed to the stockholders themselves.

In the same year that Frisco emerged from government control, Congress enacted the Transportation Act, looking toward the eventual grouping of all railroads of the country into a limited number of major systems, and assigned the task of formulating a consolidation plan to Interstate Commerce Commission, hereinafter referred to as I. C. C. (U. S. Code, tit. 49, §§ 1–5.) This act, which embodied the Federal government's railroad policies, contemplated two major steps: (1) The promulgation of a tentative plan to be followed by hearings, and (2) the promulgation of a final plan.

The Interstate Commerce Commission employed Professor Ripley of Harvard University, an authority on railroads, to assist in the promulgation of the tentative plan. On August 3, 1921, the Com-

mission promulgated what is known as its tentative plan, which, in the main, embodied the recommendations of Professor Ripley. (*Matter of Consolidations of Railways*, 63 I. C. C. 455.) This plan was apparently in every way tentative. It did not purport to take into account the difficulties and obstacles that might be encountered. Consolidation, in accordance with both the tentative and final plan, was not mandatory but was left to the voluntary action of the railroads involved. However, in the event of any attempted consolidation, deviation from the tentative or final plan was, in accordance with the provisions of the Transportation Act, subject to the approval of the Commission. From time to time deviations were sanctioned by that body.

Hearings on the tentative plan were held by the Commission for a number of years. It was not until 1929 that it promulgated its final plan. The tentative plan divided the Southwest territory into two major systems, one revolving around Frisco and the other around Missouri Pacific Railroad, generally known as "MOP." In a general way, it seems to have been contemplated that these two systems should be of equal importance and strength.

In the proposed system number 18, Frisco was grouped with St. Louis-Southwestern Railroad, generally known as the "Cotton Belt," Missouri, Kansas and Texas Railroad, generally known as "Katy," Trinity and Brazos Valley Railroad, control of one-half of which was owned by the Rock Island, and certain other railroads not important to this controversy.

In the proposed system number 19, MOP was grouped with certain other important railroads. Prior to 1926, MOP had already acquired or controlled these other railroads and thus had largely completed and rounded out its own group as set up in the tentative plan. In the proposed system number 17, Rock Island was grouped with Southern Pacific Railway Company and other railroads not germane to this controversy.

In 1924 and 1925 there was a great deal of activity looking toward railroad consolidations in the Southwest territory. Kansas City Southern, in which L. F. Loree was a leading figure, was particularly active. Mr. Loree was a railroad head most prominent in anticipating railroad consolidation by the purchase of stock of roads other than his own. Early in 1925, Kansas City Southern purchased a substantial amount of the stock of the Katy and thereupon named a member of its directors and officers. In October, 1925, Kansas City Southern purchased control of the Cotton Belt from Rock Island. Previous to that, in 1924, Mr. Brown, as chairman of the board of directors, in behalf of Frisco, had endeavored to purchase the control of the Cotton Belt but the negotiations failed because of a substantial disagreement as to the price.

In October, 1925, negotiations were actively under way for the acquisition by the Kansas City Southern of the so-called Choctaw branch of the Rock Island, a wholly owned subsidiary of Rock Island, with lines extending about 1,000 miles due west from Memphis, Tenn.

The officers of Frisco were advised in October, 1925, that these negotiations for the acquisition of the Choctaw by Kansas City Southern were actively under way. With that road owning or controlling Katy and Cotton Belt, the two principal systems grouped with Frisco in proposed system number 18, its additional acquisition of Choctaw was looked upon as particularly harmful to Frisco. Kansas City Southern would thereby have been enabled to set up a system running north and south, together with the Choctaw running east and west. It seemed, therefore, that in addition to the MOP, another powerful competitor to the Frisco in the Southwest territory was in process of creation.

It appears that Mr. Brown, Mr. Kurn and the directors of Frisco were alarmed at the situation in which Frisco was about to find itself. There seems to have been real cause for concern. The possibility of profitable traffic interchange by Frisco in its own territory under these circumstances was negligible; Frisco would be giving tonnage to competing lines, but would not receive anything in return; Frisco would have been compelled to long-haul its traffic between important points in competition with the short cuts afforded by the competitive systems.

There were frequent discussions of these problems and possible solutions between the officers of Frisco and at the board meetings. Mr. Kurn believed that Frisco was in process of being " bottled up " in its own territory. The possibility of Frisco itself acquiring the Choctaw was considered, but dismissed as not within its financial resources. After some consideration, Mr. Brown concluded that the best plan for the protection of Frisco's interests, under the circumstances, was the purchase of a substantial number of Rock Island shares. The acquisition of that stock was looked upon as a means of getting under way the ultimate consolidation of Frisco and Rock Island and, in the meantime, of preventing the sale of the Choctaw to Kansas City Southern.

The consolidation of Rock Island and Frisco seemed to be extremely desirable for various reasons. The roads complemented and supplemented each other in a variety of ways. Mr. Kurn was of the opinion that the amalgamation of both roads would result in substantial operating savings. At both the executive committee meetings and the directors' meetings, at which the purchase was authorized and approved, Mr. Kurn stated that in his opinion a

consolidation would result in an operating saving of about $3,000,000 a year. A few months after Frisco had acquired the Rock Island stock, Mr. Kurn, in proceedings before the Interstate Commerce Commission, testified that a consolidation would result in operating savings of at least $3,000,000 a year.

From the testimony given at the trial, I am satisfied that in this situation generally is found the impetus and motive for the purchase of the Rock Island stock.

In 1925 Speyer and Seligman were generally known to be the bankers of the Frisco. On or about December 11, 1925, Mr. Brown discussed with Speyer the matter of acquiring Rock Island stock. He suggested that Speyer go ahead with the purchase in the open market for its own account of Rock Island shares to the extent of about $15,000,000, and that when Speyer had accumulated the stock he would recommend to Frisco that it should purchase from them two-thirds of the stock they had bought. Mr. Brown's suggestion was approved by Speyer and reduced to writing by letters passing between them. At this time there was neither corporate authority, approval nor commitment. For Mr. Brown's own protection it was expressly understood that he did not assume any " responsibility in connection with the above."

At first glance it does seem strange and unusual that a transaction of this magnitude was set up so informally and casually. However, the testimony offered a cogent explanation and dissipated any suspicions of impropriety. It must be remembered that in 1925 and 1926 almost everyone assumed a continuity of the prevailing prosperity. In the face of the feeling of uncertainty in the world of business today, it is difficult now to comprehend the optimism and assurance with which the future was then regarded.

If the Rock Island stock was to be bought advantageously the plan required that there be no publicity. Had the plan become known, the intended acquisition of the stock would obviously have been rendered impossible, except at much higher prices. Wise or unwise, it was apparently for the good of Frisco, itself, that the plan was set up in the way in which it was.

Speyer commenced the accumulation of the Rock Island shares, and between December 14, 1925, and January 19, 1926, acquired in the open market, on the New York Stock Exchange, 275,000 shares of such Rock Island stock at a total cost somewhat in excess of $15,000,000. Before the completion of the purchase it had been arranged between Brown and Speyer that the accumulation should consist of 275,000 shares. Up to January nineteenth there was no agreement or obligation on the part of Frisco to buy.

On January 19, 1926, Speyer formally advised Frisco of the completion of the acquisition of the 275,000 shares, and offered to sell

to Frisco 183,333 shares at the average cost to Speyer of the entire lot, including usual Stock Exchange commissions and interest, together with an option on an additional 45,833 shares. The purchase price of the shares thus offered, exclusive of the option, based on the average cost of the 275,000 shares, amounted to slightly more than $10,000,000.

The option shares which represented one-half of the remaining shares, were also offered at cost, or, if Frisco preferred, a thirty-day option thereon, at a somewhat higher price. On the same date Speyer notified Frisco that Seligman had a twenty-five per cent interest in the transaction with Speyer.

Three days previously, when it was seen that the accumulation would be completed within a very few days, Brown caused notice to be given of a meeting of the executive committee for January 19, 1926, to consider whether Frisco should purchase the Rock Island shares which Speyer was acquiring. When Mr. Kurn arrived in New York on the morning of the eighteenth, he went over the whole transaction with Brown and Michel, and seems to have enthusiastically favored Frisco's making the purchase of the Rock Island shares from Speyer.

The executive committee met on January 19, 1926, when the transaction was explained and the matter discussed. The question of financing the purchase price of approximately $10,000,000 was considered. The committee adjourned without action until the following day, January twentieth. On January twentieth it reconvened, and after further consideration unanimously decided to purchase from Speyer the 183,333 shares of Rock Island stock. Both Brown and Kurn were members of the executive committee and were present at the meeting. On January twenty-second the board of directors met and took the same action. Frisco decided presently not to purchase the 45,833 shares, but accepted an option thereon for a thirty-day period at a price somewhat above cost. This option was never exercised.

The executive committee and the board of directors of Frisco made certain changes in the plan as submitted to them. In its original form it contemplated the payment of the purchase price in the following manner: The sum of $7,500,000 in Frisco's two-year notes, secured by the Rock Island stock, and the balance in cash. The executive committee and the board of directors were of the opinion that in view of Frisco's resources the note obligation was too large a commitment, and that the cash payment would unduly deplete funds on hand. Accordingly, the amount of the notes was reduced from $7,500,000 to $5,000,000, and the amount of cash to be paid from Frisco's treasury was also reduced. This difference

was made up by the sale to Speyer and Seligman of approximately 50,000 shares of Frisco common stock then held by the reorganization managers under the 1916 plan and agreement of reorganization for the benefit of Frisco. Brown was authorized to sell these 50,000 shares to Speyer and Seligman at not less than $92.50 per share. He actually sold them to Speyer and Seligman for $95.25 per share, realizing $4,762,500, which was used and applied toward the purchase of the Rock Island shares. The additional compensation to be paid to Speyer and Seligman was fixed by Frisco at $1.25 per share on the Rock Island shares bought. The purchase as thus approved and authorized was carried out.

This, in the main, I find to be the history of the transaction which is the subject-matter of this suit. It is on the basis of the alleged invalidity of this transaction that the plaintiffs seek to rescind the sale. For a fuller understanding of the entire controversy, it is perhaps well briefly to mention the more outstanding events which occurred subsequent to the purchase and prior to the commencement of this action.

Following upon the purchase of the Rock Island stock, the Frisco commenced working actively on a program for the consolidation of both roads. In December, 1929, the final groupings by the Interstate Commerce Commission were issued and the Frisco and Rock Island were placed in the same group. In April, 1926, about two months after the purchase, the Interstate Commerce Commission approved the application of Messrs. Brown, Kurn and Hirschman, directors of the Frisco, for permission to become directors of the Rock Island. In May, 1926, Brown was elected chairman of the executive committee of the Rock Island.

Early in 1927 the Rock Island began payment of dividends. Up to July, 1931, Frisco received about $5,000,000 in dividends on its Rock Island stock.

For a number of years the Rock Island stock was apparently a profitable investment. In addition to the dividends which Frisco had received, the market value of the Rock Island stock held by Frisco increased, and in the summer of 1929 was approximately $16,000,000 in excess of the cost to Frisco of the 183,333 shares. The memorable securities market collapse occurred in October and November of 1929. The dividends on the Rock Island stock continued until July, 1931. Despite the depressed market which followed the collapse of 1929, the market value of the Rock Island stock held by Frisco was, as late as December, 1930, in excess of the cost.

The difficulties encountered by railroads generally following on the heels of the financial depression are too well known to require

repetition. They still constitute today one of our major national problems of economic adjustment. In November, 1932, Frisco went into receivership, and later the plaintiffs were appointed as trustees. This suit was begun in June, 1935.

It is charged that Brown, as chairman of the board, and Speyer and Seligman, as Frisco's bankers, were fiduciaries for Frisco; that they dominated and controlled it; and that they used their power and conspired to bring about the transaction in suit, not for the benefit of Frisco, but for their own personal advantage and profit. It is also charged that the defendants concealed material facts, and that even if Speyer and Seligman bore no fiduciary relationship to the Frisco, they became liable, because they acted in concert with Brown, who as the chairman of the board was unquestionably a fiduciary.

The prayer for relief asked a decree rescinding the transaction involving the acquisition of the 183,333 shares of Rock Island common stock by the Frisco; directing the defendants to pay to plaintiffs $10,506,090.40, plus interest at six per cent from January 26, 1926, less the amount of dividends received by the Frisco on the Rock Island stock and less the present value of the 183,333 shares of Rock Island stock. An accounting by the defendants is also asked for all profits and gains of every kind received by them growing out of the matters and things set forth and for a full accounting by the defendants as trustees for the Frisco.

In seeking a rescission the plaintiffs do not tender a return of the shares of Rock Island common stock. The reason set forth is that prior to its acquisition there was an unpaid mortgage executed by the Frisco on July 1, 1916, commonly called a " prior lien mortgage " upon the property of the road then owned by it to secure bonds to the amount of $250,000,000. That mortgage provided that all stock acquired by the Frisco after that date must be delivered to the trustees under the mortgage. The defendants are alleged to have known that the Frisco was required to deliver the stock to the trustees and the Rock Island stock acquisition was actually so delivered by defendant Brown and the officials of the Frisco. This is the reason the stock is not available to be tendered and delivered by the plaintiffs as trustee to Speyer and Seligman.

The complaint was subject to an attack by defendants by motion under rule 106. It was dismissed by Special Term on the ground that it stated conclusions of law and not facts. Upon appeal the order was reversed and the motion to dismiss denied. (*Lonsdale* v. *Speyer*, 249 App. Div. 133.)

In order to appraise the evidence submitted it may be well to consider the extent to which the specific determination of the

Appellate Division has any bearing. The complaint, so far as it was held to state a good cause of action for rescission or for an accounting, recited that all the defendants as investment bankers, together with the director of the railroad, " while occupying trust relationship," did secretly confederate and conspire together to use its funds and property and to manipulate its financial affairs for their own benefit. This was deemed a sufficient statement of a conclusion of fact of a conspiracy, considering the complaint in its entirety. Whether the evidence indicates a conspiracy to manipulate the financial affairs for the benefit of defendants here we shall consider momentarily.

The complaint further recited that the bankers were " confidential and trusted advisers, agents and guides " of the corporation and these allegations indicated the claim that they stood in a fiduciary relation to the Frisco. The pleading also contained an allegation that Brown, as chairman of the board of directors, was the fiduciary of the Frisco. About this last allegation there can be no dispute. The complaint also recites that while the directors were the ones who technically dictated the purchase of the stock, nevertheless their conduct was the result of the domination and control of the chairman, and not their free act.

The conclusion of the Appellate Division, based upon the language of the pleading itself, lays down the following principles:

" When a fiduciary uses his power, not for the benefit of the *cestui que trust*, whose interests alone he should protect, but uses it for his own personal advantage and profit or for the advantage and profit of a third person, that constitutes a fraud and such conduct is enough to charge him with a duty to account.   *   *   *

" There is no question that defendant Brown was a fiduciary of the Frisco.   *   *   *   One who co-operates with a fiduciary in his breach of duty becomes liable in every way as the fiduciary with whom he co-operates.   *   *   *   The words ' domination ' and ' control ' as used in the complaint constituted a statement of facts and the legal relationship in question arose from those facts."

While the pleadings have been held sufficient, it is another question whether they have been sustained by the evidence. This is the matter which we have to consider now.

A recital of the facts indicates that the contract itself for the acquisition of the 183,333 shares of Rock Island was a proper contract for the Frisco to enter into. It is not necessary to repeat the facts to substantiate this, and if the defendant bankers stood in no fiduciary relation to the Frisco the entire action for rescission would fail. If Brown and Speyer entered into a conspiracy, however, for the advantage of the bankers, or perhaps for the incidental

advantage of Brown himself, to consummate this deal, then, in the absence of other circumstances, plaintiffs could rescind, notwithstanding the fact that the transaction could not have been impeached if no fiduciary relation had existed between the parties. (*Hawkes* v. *Lackey*, 207 Mass. 424; 93 N. E. 828.) In such cases, contrary to the general rule in other cases of fraud and deceit, it is not necessary to show injury or damage to the party whose confidence was abused, but it is sufficient to show that the trustee or person confided in has derived some secret benefit or advantage from the transaction. (Black on Rescission and Cancellation [2d ed.], § 48.) In the case at bar the undoubted fiduciary relation of Brown to the Frisco, and his co-operation with the bankers in possible violation of his strict trust duty, might render the bankers liable under certain circumstances, even though they did not stand in any fiduciary relation to the Frisco.

Outside of the chairman of the board, Brown, it is not sought to hold the members of the board accountable for the approval of the transaction. The fact is that one of the directors, Kurn, is himself a plaintiff in the action as one of the trustees for Frisco. The evident reason why the directors are not charged with accountability is because they are alleged to have been under the domination of Brown, the chairman. This alone would not absolve them from liability for being servilely complaisant and pliable instruments in the hands of a dominant personality. At least it would save them from the stigma of being charged with being active members of the conspiracy. It is not necessary, however, to dwell upon this phase because the evidence falls far short of proving that the directors were mere dummies in the hands of Brown. They were men of great prominence in the financial community, railroad men and bankers and persons who represented other large financial interests. True, the bankers themselves had named two on the board, but this was well known to the others and such membership was in accordance with the common practice. The directors so named by the bankers, together with the chairman, constituted only a small fraction of the board. It is true that the directors did not individually make excessive statistical examination into the wisdom of the purchase. They did, however, pass upon the broad question of policy and use their independent judgment.

It is not for the court to review the discretionary acts of the officers and directors of a corporation unless it appears that the acts were fraudulent, collusive or for selfish or personal motives. Nor is the court required to determine whether the acquisition of the Rock Island shares was or in fact turned out to be the best plan in the circumstances. An error of judgment is not sufficient on which to

base liability. The transaction was entered into by the Frisco in the judgment of its officers and directors for what seemed to them to be for the best interest of Frisco.

It is always difficult to appraise judgment or exercise of discretion made or taken many years ago. It is too difficult to transplant oneself into the contest and setting of the time when the judgment was made. But even today with the added wisdom gained in the recent years in the field of finance and economics, the transaction still seems to have been a natural one, entered into by the Frisco for its own best interest. The investment continued to be lucrative for a number of years afterwards. The purchase now presents itself for re-examination only because of economic adversity which was not and could not have been fairly foretold or envisaged at the time.

The transaction was more or less contemporaneously examined by both the Missouri State Public Service Commission and by the Interstate Commerce Commission. The Missouri State Public Service Commission, after a hearing on an application for approval and authority for the issuance of the notes by Frisco for the acquisition of the Rock Island stock, entered an order granting approval and authority, reading in part as follows: " That the common stock of the Chicago, Rock Island and Pacific Railroad Company to be acquired through the issue of said notes is necessary to and reasonably required by said Railway [Frisco] for its future development and the expansion of its service."

Promptly upon acquiring the Rock Island shares Frisco made application to the Interstate Commerce Commission for leave to seat three of its directors upon the Rock Island board, Messrs. Brown, Kurn and Hirschman. In accordance with the Transportation Act the consent of the Commission to this interlocking directorate was required. Mr. Kurn had charge of this application to the Interstate Commerce Commission. Hearings were held by the Interstate Commerce Commission and considerable testimony taken. The Interstate Commerce Commission entered an order early in 1926 approving the seating of the three Frisco directors on the Rock Island board. The Interstate Commerce Commission order was, in a sense, an inferential, if not a direct, approval of the purchase.

If, however, Speyer and Seligman bore a fiduciary relation to Frisco generally and in the transaction in question, the transaction must be re-examined in the light of that fact. A contract between strangers dealing at arm's length, which might be free from criticism otherwise, might become the subject of possible challenge by reason of fiduciary relation between the parties. The chairman of the

board of directors, Mr. Brown, while undoubtedly occupying a fiduciary capacity, was not guilty of any breach of duty, nor did he act collusively with Speyer and Seligman.

Let us see whether the bankers themselves occupied such a relationship toward the Frisco as to be chargeable with the high standard of conduct expected from fiduciaries. The allegation in the complaint that the bankers were the confidential and trusted advisers, agents and guides has been held by the Appellate Division to indicate a statement of fact that they occupied a fiduciary relation. The evidence, however, belies the allegation.

That the relationship between Speyer and Seligman, on the one hand, and Frisco, on the other hand, was friendly and even confidential may be admitted. But most of the business relations between persons in a sense and to a degree rest upon confidence reposed by one in the other. Without it the commercial dealings of a community would be seriously restricted. Doubtless Mr. Brown and Frisco directors had confidence in and were friendly to Speyer and Seligman. If they had been hostile it is unlikely they would have continued to do business with each other.

Speyer and Seligman had purchased the Rock Island stock with their own funds and at their own risk. Having thus acquired the stock they offered to sell a part of it or all to Frisco. Frisco elected to buy. The initial suggestion that Speyer should purchase the Rock Island shares and then offer them to Frisco came from Mr. Brown when he sought the co-operation of Speyer and Seligman in meeting a Frisco problem. This is the transaction stated in its simplest form.

At the meetings of the executive committee and of the board of directors, at which it was determined that Frisco would purchase the Rock Island shares, Mr. Brown read the letters of December 14, 1925, and December 15, 1925, which initiated the transaction. The formal offer of Speyer of January 19, 1926, to sell a portion of the shares to Frisco, was likewise read. This letter and other relevant papers were attached to the minutes. Frisco knew that Speyer and Seligman were the owners of the shares in question and that they were selling them to Frisco.

The antecedent transactions between Speyer and Seligman and Frisco consisted in the main of the purchase by Speyer and others of securities which Frisco wished to issue and sell. In these transactions Frisco sold the securities in question. Speyer and others associated with them purchased. There were, of course, negotiations and discussions as to the terms and conditions of the securities to be issued by Frisco and the form that the security was to take. Speyer and those associated with them in the purchase made suggestions and offered advice to Frisco about these issues of securities.

After the 1916 reorganization and prior to 1926 Speyer and Seligman participated in four security issues. In none of them did they act alone. In these four instances the securities were sold by Frisco to Lee, Higginson & Company, Guaranty Trust Company of New York, and Speyer and Seligman. Frisco also maintained cash balances with Speyer and Seligman from time to time. There were, besides, certain other transactions of minor importance occurring between Frisco and Speyer and Seligman. None of them is of any particular moment.

The evidence discloses that Speyer and Seligman gave confidential advice to Frisco. That did not constitute the relationship a fiduciary one. (*Doheny* v. *Lacy*, 168 N. Y. 213, 222.) There was no such reliance by the directors upon the confidential advice given by the bankers, as there is on the part of a layman who is helpless in financial affairs and relies entirely upon his investment counselor. There is nothing even remotely resembling the situation of superiority of knowledge and dominance on the one hand, and ignorance and blind faith on the other. The directors of Frisco were all men of superior financial knowledge and experience in investment matters. Nothing was concealed from them. While the transaction was approved by the directors in a very short period, this itself is not a circumstance from which an inference of blind faith can be drawn.

I am not unmindful of the fact that in voting to purchase the Rock Island shares neither Brown, Kurn nor the other directors had before them detailed engineers, auditors or legal reports. They did have before them the annual reports of Rock Island which gave in considerable detail operating and maintenance figures as well as a mass of statistical information. Both Mr. Brown and Mr. Kurn were familiar with Rock Island property and its physical condition. After the purchase of the Rock Island shares was concluded the reports and studies of the Rock Island property made by the Frisco officials with Rock Island's co-operation confirmed their view of the wisdom of the purchase.

The Rock Island transaction was apparently different from the contemplated purchase of several relatively small or unimportant roads in respect of which Frisco obtained detailed reports. In the case of these smaller roads little if any information was generally or publicly available. In the case of Rock Island enough information and data was already publicly available upon which directors could consider the matter. It is not necessary for me to determine how much more the directors might have done; it is sufficient, it seems to me, for purposes of this case, to believe as I do that the

directors honestly and reasonably thought that they had sufficient information upon which to reach a decision.

It requires no further demonstration that the transaction by which Frisco bought 183,333 shares of Rock Island stock was one of purchase and sale involving that railroad and the bankers. It is easy to cast suspicion and impute sinister motives to them in making the sale, by reason of the fact that they retained a little over 91,000 shares for themselves out of the 275,000. By the fact that such a large number of shares was put into the treasury of the Frisco and thus withdrawn from active market speculation, a preferred market, it is charged, was created for the 91,000 shares retained by the bankers. To sustain the charges of unfair dealing it is necessary to make a series of violent assumptions. The charge that the bankers violated the fiduciary relation which they owed to the railroad is entirely dispelled by the fact that no fiduciary relation existed. This could only be urged if the 275,000 shares were to be regarded as a joint venture between the Frisco and the bankers. But not even a scintilla of claim or evidence is presented on this point. Treated as a transaction between parties who stood legally at arm's length, there is no proof of fraud or concealment on the part of the bankers, or collusion with Brown, who was, indeed, a fiduciary, to justify any criticism of Speyer and Seligman.

A finding that the bankers did not stand in any fiduciary relation toward the Frisco, nor that they conspired with a fiduciary of the railroad, namely, the chairman of the board, would make further examination of their conduct unnecessary. It is necessary, however, owing to the financial firms' high standing in the community, to examine some of the specific charges in order to dispel any accusations which would stigmatize their actions as morally reprehensible by reason of overreaching or sharp practice.

On the whole, it is to be remembered that there was no obligation on the part of the bankers to render services to the Frisco gratuitously. The actual compensation for their services was the charge of one dollar and twenty-five cents per share, which, by express contract with the Frisco, authorized by the board, they were entitled to receive. That compensation is anything but excessive when it is remembered that the bankers, at their own cost and risk, accumulated the entire block of shares, taking the chance that the Frisco might not approve the purchase from them. The plaintiffs, however, charge that since it was the obligation of the bankers by the contract to turn over the stock at cost, plus interest charges, they had no right to charge the regular Stock Exchange commissions for the purchase of these shares, but only such commissions as they themselves had paid out to other brokers. The

bankers, as members of the Stock Exchange, were entitled to the regular broker's commissions. If they did not execute the purchase themselves and let other brokers do it they paid as members of the Stock Exchange a much smaller rate to the brokers who executed their purchase. It is the advantage of this saving that plaintiffs seek. The demand is unreasonable, because, in any event, if Frisco had purchased these shares in the market full Stock Exchange commissions would have been charged. Not only were the bankers legally entitled to charge the full commissions and the service charge of one dollar and twenty-five cents per share, but their position morally is also unassailable. In all these transactions plaintiffs forget that if intermediate between the accumulation by the bankers of the stock and the purchase by the railroad, some financial cataclysm or other complication had happened in the financial world, the bankers would have been stranded with the full outlay for the stock.

Incidentally, by reason of the fact that a service and a commission charge are made, plaintiffs endeavor to clothe the bankers with the status of stockbrokers, with the Frisco as the customer. It is clear that when the bankers purchased the stock for their own account they were acting as principals. The brokerage charge to which they were entitled was by reason of the fact that they were members of the Stock Exchange, and it was not intended that they would give to a later buyer the benefit of the service charge, nor the benefit of the purchase free of commissions except the sum paid by the bankers to the sub-brokers. If they had not been members of the exchange full commission would have been added to the cost. Why should they be penalized by reason of their membership? In any event, when they purchased the stock they were acting for themselves. The cost of the stock was the price at which it was bid in plus the Stock Exchange commission, even though the bankers actually did not have to pay out the full commission. There was thus neither a fiduciary relation created by reason of the purchase of the stock by the bankers and receipt of benefits of Stock Exchange commissions, nor a principal-agent relation created by reason of a service charge of one dollar and twenty-five cents per share. The latter charge was the profit to the bankers agreed upon between the parties. There is a slight analogy with the contractor who undertakes to do a construction job on the basis of cost plus ten per cent. That arrangement does not make the contractor an agent for the owner. The position of the bankers here is even more remote from agency than that of the contractor in the example cited. The latter takes no risk of his own, but the former acquired the stock at their own cost and risk without any certainty that the Frisco would make the purchase.

Some imputation as to the motive of the bankers is cast by reason of the fact that the residue of 91,000 shares which they retained became more valuable by reason of the fact that 183,333 shares in possession of Frisco were rendered immobile, and thus enhanced the opportunity for profit to Speyer and Seligman. There is very little substance to this argument. In the first place, Frisco had the option to purchase half of the 91,000 shares at only slightly above cost within thirty days of the other transaction; in the second place, the entire purchase was not more than about twenty-one per cent of the total outstanding issue of Rock Island. If Speyer and Seligman had any sordid motives in the matter, except the regular legitimate commercial intention, they might have, between the date of the purchase and 1929 or later, secured from the Frisco some of its Rock Island holdings by a private purchase without disturbing the market and secured large profits thereby. The fact is that between 1926 and 1929 Frisco's investment showed a paper profit of $16,000,000 above the purchase price. Even as late as September, 1930, the market price continued over par, and until December, 1930, the market price was above the amount paid by Frisco. The charge is made, without proof, that by virtue of the Speyer influence the stock was not sold so as to realize a profit. While it is true that the stock was in the possession of the trustees of the prior lien mortgage, the conditions of the mortgage permitted Frisco to sell the stock at the market, provided the proceeds were either turned over to the trustees or reinvested, and the reinvested shares delivered to the trustees. The probable reason why the stock was not sold was because it had not been bought for speculation or trading purposes but for strictly railroad purposes.

On the consideration of all the evidence the claims of the plaintiffs against Speyer and Seligman cannot be sustained, whether we regard them as parties trading at arm's length or dealing with each other as fiduciaries.

Some mention has already been made of the alleged domination by defendant Brown of the board of directors. There probably are a number of reasons why the charges along this line have not been followed by the plaintiffs. The board of directors, although not made defendants except for Chairman Brown, would be liable for gross negligence and for acting with precipitate haste without an investigation. It would have been rather embarrassing for the plaintiffs, one of whom, Kurn, is a former director, to have made the board defendants. They were morally exculpated by the charge that Brown dominated their conduct. This, as has been observed, is without support in the proof. Something, however, might be said in fairness to Brown, in connection with the charges of bad

faith made against him. It is alleged that he promoted the deal because he expected preferment in the railroad world by way of election as an executive of Rock Island. The conduct of a fiduciary may be motivated by hopes of preferment, which are not only pardonable but at times laudable, but unless the promise of such advancement is the motive concealed from directors, which prompted Brown's conduct, it cannot be considered as a ground for sustaining the charges. The evidence does not sustain any connection between Brown's election as chairman of the executive committee of Rock Island in May, 1926, and the promotion of the purchase complained of here. The following explanation of the antecedents of Mr. Brown's election and the fixing of his salary, are quite persuasive: It appears that for some time prior the Rock Island had felt the need of an additional executive to assist Mr. Gorman, its president. Mr. Charles Hayden, the prominent financier, who, the plaintiffs claim, was antagonistic to both Brown and Speyer, and was vitally interested in the welfare of Rock Island, in March, 1926, expressed the opinion in a written memorandum to Mr. Bell, its general counsel, that Mr. Brown " may fill a long found want for us." The directors of the Rock Island entertained a high regard for Brown's ability and were very pleased to have his services.

A committee of directors of Rock Island was later appointed, consisting of Messrs. Charles Hayden, Alfred A. Cook, an outstanding member of the New York Bar, who had had a large and varying knowledge of railroads as a result of his legal work in connection with many railroad reorganizations, and A. C. Rearick, also of the New York Bar, who had been connected with the Federal Administration of Railroads during the World War, to determine what Mr. Brown's salary should be. This committee did not report until some nine months later, during which period the members of the committee had an opportunity of observing and appraising Mr. Brown's value to Rock Island. When the committee came to make its report it was Mr. Cook's recollection that it was Mr. Hayden who suggested the amount of the salary to be paid to Brown and the amount when finally approved by the board of directors was made retroactive to the commencement of Mr. Brown's services.

The final claim of the plaintiffs to be considered here is the demand for an accounting of the excess profits of 50,000 shares of Frisco stock sold to Speyer and Seligman. This sale was agreed to by the board of directors on January 22, 1926, upon ratification of the resolution of the executive committee of January 20, 1926, which called upon the reorganization managers " to sell upon such terms and conditions as the Chairman may determine, at not less than $92.50 per share, 50,000 shares of the common stock of this Company

held by them as Reorganization Managers, and to pay the proceeds of said sale to or on the order of this company."

The actual price obtained upon the sale to Messrs. Speyer and Seligman was 95¼, and the understanding upon which these shares were sold at that price was as follows: " It is understood that in case the average price at which said stock is resold by you exceeds its par value, the purchase price of said stock is to be increased by an amount equal to one-half of such excess, such additional amount to be payable upon the closing of the account."

The question raised by the plaintiffs is that the bankers have failed to account for any profits above $100 a share, which they may have received upon the resale of that stock.

The liability to account in an action in equity would arise if the bankers were joint venturers with the Frisco. There was, however, no such relation in the transaction. It was a sale by the Frisco at a definite price to the bankers, who held the stock for their own account and risk. If there had been a provision in the agreement that the Frisco should reimburse the bankers for any losses, as well as profits, there might have been a foundation for the claim for an accounting.

Obviously, the only other basis for a fiduciary relation which might be spelled out is that of agency of the bankers in handling the 50,000 shares transaction. The facts, however, involving as they do an outright sale to the bankers, negatives any such assumption. The contract must thus be interpreted as a contractual claim which Frisco could assert in the event that the bankers received more than par on the resale of their stock. Transactions of this character are quite common. They are more frequent in situations where an employee obtains a percentage of the profits of the business in addition to his stipulated salary. The authorities are unanimous that in such cases, especially in the absence of any stipulation to share losses as well as profits, there can be no claim for an accounting. A typical recent example of that type is *Byrne* v. *Blaker Advertising Agency* (239 App. Div. 395). But in such cases an aggrieved employee must pursue an action at law and obtain his facts, as to the probable profits of the concern, by a method of discovery and inspection or other procedure allowed by law.

More closely allied to the instant case is *Beaty* v. *Bacon* (187 App. Div. 447). In that case defendant had secured, through the efforts of the plaintiff, stock for $50,000. In consideration therefor, defendant agreed to pay plaintiff one-third of the net profits when and as the same might be ascertained upon the sale of the stock. There was an understanding that the stock was to be the absolute property of the defendant, with the right to dispose of the same at

any time without consulting the plaintiff, whose sole interest was stipulated to be whatever profits might be realized by the defendant. The action was brought by the plaintiff at law on the theory that defendants had had a reasonable opportunity to sell the property for a very high price but had refused to accept it. There was a further allegation that more than a reasonable time had elapsed to enable defendants to make the sale at a profit, and defendants had refused to sell the stock. A motion to transfer the case to the equity side was granted by the court below. This ruling was reversed by the Appellate Division. It was held that the action came within the rule in *Simon* v. *Burgess* (146 App. Div. 37) and *Simon* v. *Etgen* (213 N. Y. 589) which denied the existence of any trust relation under such circumstances.

The absence of a trust relationship or a joint venture agreement, whereby the seller was to participate in the losses as well as the profits, is fatal to a right to an accounting. This disposition is not to be construed as a mere denial of rights of the plaintiffs on a bare technicality. Ordinarily, such an incidental question in a large litigation might be disposed of by the court. There is, however, an absence of any proof by the plaintiffs that the 50,000 shares sold at an average price above par.

On the trial plaintiffs were requested to, and at least on one occasion stated, that they would submit a tabulation giving details of sales as claimed by them, showing an average realization in excess of par. But no such tabulation was submitted other than exhibits wherein are set forth all sales of Frisco common stock, which include not only the resale of the 50,000 shares but also of other Frisco common shares purchased and sold by Speyer and Seligman for their own account. Neither is any such tabulation setting forth plaintiffs' claim in respect of the 50,000 shares to be found in the plaintiffs' brief.

But even if a fiduciary relation should be spelled out on the whole case, by reason of the relation between the Frisco and the bankers, an action in equity, except possibly where a joint venture relation was made out, would be barred by the six-year Statute of Limitations which is pleaded here. The right to recover, if any, rests upon an express contract and would be adequately protected by an action at law. Therefore, even if an equitable remedy lay, the existence of a concurrent remedy at law would make the shorter period of limitations applicable to the case.

An interesting recent case is *Gervis* v. *Halsey* (250 App. Div. 297). It is particularly applicable because it was an action in equity by a customer against a firm of stockbrokers for an accounting. It is, of course, undisputed that the relation between a stockbroker and

his customer is a fiduciary one. It was precisely one of the arguments used by the plaintiffs in the instant case in a vain effort to establish a fiduciary relation by showing that the bankers had acted for the Frisco partly in the capacity of stockbrokers in the purchase of the Rock Island stock. In the case just cited the question under consideration was whether the ten-year statute or the six-year statute applied. The court held that the complaint was based upon an express contract and stated facts upon which a recovery might be had at law. It did not disapprove the use of the equitable remedy but it held, in line with the previous authorities, that where a concurrent remedy at law and in equity existed, the period of limitations covering an action at law applies. The language of the case is appropriate enough to be quoted at some length: " The plaintiff, however, claims that the ten-year statute (Civ. Prac. Act, § 53) applies, since this is an equity action. Clearly, the underlying purpose of this action is to recover upon an express contract obligation. The fact that plaintiff has chosen to frame his complaint in equity does not of itself call for the application of the ten-year Statute of Limitations. In *Keys* v. *Leopold* (241 N. Y. 189) Judge ANDREWS wrote: ' For the purposes of this case we shall assume that the complaint states a cause in equity for an accounting. We shall assume also that, as respondent claims, the action is governed by section 15, subdivision 2, of the Civil Practice Act and that the time within which it must be begun is to be computed from 1916 when a demand was actually made. The question still remains, however, whether the basis of the action is to recover upon a contract obligation or liability express or implied, or damages for an injury to property controlled by the six years' statute under section 48, or whether this is an action the limitation of which is not specifically prescribed and, therefore, one that must be commenced within ten years under section 53. The mere fact that this is an action for an accounting is not determinative of this question. When a legal and an equitable remedy exists as to the same subject-matter, the latter is under the control of the same statutory bar as the former. (*Rundle* v. *Allison*, 34 N. Y. 180.) Nor is the fact that the defendants received this money in a fiduciary capacity and may, therefore, hold it under such a trust as the law may imply for the purposes of justice (*Mills* v. *Mills*, 115 N. Y. 80).' "

The Statute of Limitations has been pleaded, and even as an action at law the claim, based upon the resale price of the 50,000 shares of Frisco stock by the defendants, must be deemed barred.

There must be judgment for the defendants on the merits. Submit decision and judgment accordingly.