**EASTMAN v. MORGAN et al.**

District Court, S. D. New York.
Feb. 26, 1942.

Shulman, Shulman & Abrams, and Meyer Abrams, all of Chicago, Ill. (Bennett I. Schlessel, of New York City, of counsel), for plaintiff.

Davis, Polk, Wardwell, Gardiner & Reed, of New York City (Ralph M. Carson and Francis W. Phillips, both of New York City, of counsel) for defendants George Whitney and Guaranty Trust Co. of New York.

BRIGHT, District Judge.

The plaintiff and the defendants George Whitney and Guaranty Trust Company, who are the only defendants served in the action, move for summary judgment upon the same papers, and both state there are no controverted questions of fact.

This action was originally brought by Elias Hackner, C. J. Bowman and Lees Ballinger for themselves and others similarly situated as former holders of five year 6% gold notes of the Van Sweringen Corporation (here called the "Company") against the same defendants, for the same relief as now asked. An appeal was taken from an order dismissing the complaint for lack of jurisdiction and refusing an amendment striking Bowman and adding Grace W. York and Eunice E. Eastman as plaintiffs. That order was affirmed in Hackner v. Guaranty Trust Co., 2 Cir., 117 F.2d 95, 97, as to all but Eunice E. Eastman. The Circuit Court of Appeals decided that the action was not a derivative one; that, therefore jurisdiction as to each plaintiff could only be based upon a claim exceeding $3,000, and that none of the plaintiffs, including Grace W. York, had a claim of that amount. It permitted the continuation of the action by Eunice E. Eastman, present plaintiff, who formerly held $10,000 of the notes in question, which she had purchased on February 6, 1931, for $7,750. Judge Clark said as to the nature of the cause of action: "The claim here stated is for misrepresentation, whereby the plaintiffs were induced to make a sale of their notes for less than their true value. Clearly, each plaintiff, to prevail, must show that he himself was misled by the defendants' misrepresentations, and that as a result he sustained a loss."

After that decision, certain portions of the complaint were stricken to conform thereto. As the complaint now stands, it is a counterpart of the former as applied only to the present plaintiff. It alleges: On or about October 29, 1931, plaintiff was induced to exchange her notes for 50% in cash and 50% in common stock of the Company, the stock being still held by her and being worthless. The offer of exchange was made by the Company on the date mentioned, the common stock given in exchange being supplied by the defendant Morgan & Company, which released such stock then held by it as collateral, and received in exchange therefor the gold notes and other assets. The defendant Guaranty Trust Company was the trustee under the trust instrument securing a total issue of $30,000,000 of the notes, which provided, among other things, that the Company would maintain "segregated assets" to the extent of 50% of the principal amount of the notes outstanding, and in the event of a decline in the market of the "segregated assets", the Van Sweringens individually agreed to supply additional securities to be known as "assigned securities". The Company had no funds to meet the interest payment due on November 1, 1931, and upon a default in that payment, the notes would become immediately payable. At that time there were outstanding $26,234,000 of notes and the current market value of the segregated assets, assigned securities and government obligations of the Company was $13,440,681.88. In the event of the acceleration of the notes, the last mentioned amount would have been applied toward the satisfaction of the note indebtedness, and the noteholders, who, it is said, were practically the only creditors, would have had applied to the deficiency all of the remainder of the assets of the Company, which it is claimed, were then of substantial value. In order to prevent such acceleration, the defendants, it is alleged, on October 29, 1931, secretly entered into an agreement to make the offer of exchange and to supply the funds to meet the interest payment, and thereby they would be able to obtain the notes together with the assigned and segregated assets in exchange for the worthless stock of the Company. Said agreement also approved the form of the offer to be made and provided for the release by Morgan & Company of the common stock in exchange for the notes. The defendant Morgan & Company, with the aid of Guaranty, made the exchange, it is alleged, retained the gold notes as uncancelled, and used $5,613,500 of the segregated and assigned assets to acquire $11,227,000 of notes outstanding and $3,773,000 of notes in the treasury, aggregating $15,000,000, which notes were cancelled. This cancellation released from the trust agreement the assigned and segregated assets aggregating $7,827,181.86, which, it is claimed, Morgan & Company received together with the $15,000,000 of uncancelled notes, thereby appropriating the remainder of the valuable assets of the Company as its largest creditor. The net result of this secret deal, plaintiff says, was to relegate the former holders of the notes to holders of worthless common stock, and to give to Morgan & Company the available cash, $15,000,000 of notes, and the remainder of the Company's assets in exchange for the worthless stock. It is further said that defendants knew the stock was worthless and in order to deceive the

noteholders, prepared a balance sheet, which scheduled as an asset of the Company an investment of $29,253,066.30 in capital stock at cost of the Cleveland Terminals Building Corporation, a wholly owned subsidiary of the Company, an open account due from that subsidiary of $27,-133,533.76, giving a net value to the 1,-744,800 of common shares in the amount of $34,896,000. Instead of valuing the assets at current market value or fair cash value, as called for by the trust indenture, they were valued at cost in the statement. In truth, it is alleged, the subsidiary was insolvent, the investment in its capital stock worthless, and its open account was not fully collectible. If the real information had been disclosed to plaintiff, she would have received not only the 50% she did receive, but in addition, would have participated in all of the assets of the Company to satisfy the deficiency in the other half of her notes. The relief demanded is for an accounting of all funds and property received by defendants as a result of the exchange, or that defendants be held liable for the damage caused to the noteholders and that the Guaranty be determined to have breached its fiduciary duties to protect the rights of the noteholders and be held liable to them for damage. It also asked for the appointment of a trustee or receiver.

We are admonished to construe the pleading as to do substantial justice. Rule 8(f) of the Rules of Civil Procedure, 28 U.S.C. A. following section 723c. So construing this pleading, I am inclined to the opinion that it is "double barreled", alleging rather inartistically not only misrepresentation but possibly a breach of trust. There is no allegation of a direct misrepresentation. There are allegations of concealment of the alleged agreement to which defendant Morgan & Company is claimed to have been a party and deception in the balance sheet, and other allegations from which may be spelled out a claim of breach of trust on the part of the defendants.

 Having in mind, as stated by Judge Clark, that this plaintiff must show that she was misled by the defendants' misrepresentations, it is clear from her testimony that no representations were made to her by any of the defendants. In her deposition she testifies that the offer to buy the notes was made in a letter from the Company, sent to her with balance sheets of the Company and of the Cleve-

land Terminals Building Corporation, by Lee Higginson & Company, who had been for some time before brokers with whom she had had other dealings and through whom she had purchased the notes in the first place. She saw and read these letters and balance sheets. She relied upon her father's judgment in the matter of the exchange, and talked with no one connected with Lee Higginson & Co., J. P. Morgan & Co. or the Guaranty Trust Co. at any time. She made no inquiries from anyone except her father as to the value of the common stock given in exchange, certainly not from any of the defendants, and she could not say whether any of the defendants had committed any fraud in the matter, she knows nothing about that. There is no proof that the balance sheets sent to her were false or fraudulent in any respect. And there is no proof of any deception as to the value of the common stock given in exchange. There were no statements as to that except those contained in the balance sheets. No one said it was worth any more or any less than those sheets showed. The balance sheets furnished by the Company and Lee Higginson & Company to the plaintiff showed a deficit in capital of the Company of $2,-122,361.72. The assets of the Company, as shown by the balance sheet, consisted of $13,444,674 of segregated assets under the note indenture, which were distinctly marked "unpledged", and $56,407,650 invested in the Cleveland Terminals Building Company. Of this $56,407,650, $29,-253,066 was capital stock of the Cleveland Corporation, based on cost, without giving effect to market value of listed securities. The balance sheet of the Cleveland Company showed that these listed securities had depreciated in value from $93,-762,652 in 1929 to $8,266,427 on September 30, 1931. In the Cleveland balance sheet, they were valued at $37,231,927 cost. The difference between cost and market—$28,-965,500.—practically wiped out the investment in the Cleveland Company stock shown as an asset in the Van Sweringen balance sheet. If the current market value, therefore, had been reflected in the Company balance sheet, its capital funds would practically have disappeared, and the common stock would have little, if any, value, as plaintiff admitted upon her examination. I have not discussed a similar depreciation in Cleveland real estate, which plaintiff assumed was depressed along with other values, or other facts

tending to show the rather doubtful value of the Cleveland Company's open account. I cannot see how there can remain any claim of misrepresentation.

The plaintiff bases the other part of her claim upon the affidavits and exhibits upon which the defendants move for summary judgment. It is obvious that there was no fiduciary relation existing between her and Morgan & Company but that might not be so in respect of the Guaranty Trust Company, who was trustee for the benefit of noteholders. Both Morgan & Company and the Guaranty Trust Company, individually, were creditors of the Van Sweringen interests to the extent of $11,-000,000 each, under loans made on October 30, 1930. In that situation, as Morgan & Company knew, the Guaranty Trust Company had both an individual and fiduciary interest to serve. It thus owed its first duty to its trust, as Morgan & Company also knew. Do the facts now presented show that the trust was betrayed by the Guaranty Trust with the cooperation of Morgan & Company, to the detriment of the plaintiff?

■ On May 1, 1930, a trust indenture was entered into between the Company and the Guaranty Trust Company as trustee, under which $30,000,000 of Five Year 6% Gold Notes were to be issued by the Company. The notes referred the holders thereof to the indenture for the terms upon which they were issued, and nowhere stated that they were secured by anything. Under the indenture, the Company agrees cotemporaneously with the issuance of the notes, to acquire free of lien 500,000 shares of Alleghany Corporation common stock, which are to be known as "segregated assets", and which, until such time as at least $15,000,000 of the notes are retired and cancelled by the application of the proceeds of the segregated assets, shall not be mortgaged, pledged, sold or otherwise disposed of by the Company, except for cash, the cash either to be held, or used to retire and cancel the notes, or to purchase other Alleghany stock or United States Government obligations, or to purchase the notes and hold the same uncancelled in its treasury. It is specifically stated that "none of the segregated assets shall be deemed in any way to constitute collateral security for the payment of the notes or as being set aside for such purpose, nor shall the restrictive provisions of this indenture in respect thereof be deemed to be a mortgage, pledge or other incumbrance thereof or lien thereon." The indenture further provides that, cotemporaneously with its execution, the Company would obtain the execution of an agreement by O. P. and M. J. Van Sweringen for the benefit of the noteholders, by which they would agree that they would assign and deliver to the Company readily marketable securities to an amount sufficient, when taken at their current market value, to equal any deficiency which might occur if the Alleghany stock and any other security in the segregated assets, plus the market value of the assigned securities, shall be less than 50% of the aggregate principal amount of the notes outstanding. But it is expressly provided that assigned securities "shall be available to the creditors of the Company for application to the payment of its indebtedness and liabilities". All obligations of the Van Sweringens were to terminate as soon as $15,000,000 of the notes should have been retired and cancelled.

The trust indenture, so called, is a peculiar instrument. It is obvious from a reading of it that there is no trust res. It does appoint the Guaranty Trust Company as trustee, but the latter's duties thereunder are to receive and pay out interest and principal, and it is empowered to enforce the notes in the event of default, but it is not required to do so unless indemnified. The only properties that might look like security were the segregated assets and the assigned securities, but the trustee never had title to or possession of them. They were at all times to be in the possession of the Company. And the trust indenture did not prevent the Company from mortgaging or pledging the same for a term not exceeding one year for the current requirements of the Company or its subsidiaries, such as interest, taxes, rentals and general administration expense, or from selling or otherwise disposing of the same for the same purposes. And the securities assigned by the Van Sweringens were to be held by the Company "until such time as the Company and/or any other lawful authority disposes thereof in order to provide funds necessary for the payment of the indebtedness of the Company, for which payment the Company does not have cash and/or other current assets available." Although the Company, on request of the trustee, agreed to furnish the trustee in detail with information as to any and all of these matters, the trustee was under no duty "to re-

quest any such information or to take any action in respect of any information so furnished."

It is clear that the notes were unsecured and represented no more than an ordinary obligation of the Company.

It became obvious within six months after the trust indenture was made, and because of the depressed market conditions, that the Company and the Van Sweringens would not be able to maintain the segregated assets at 50% of the notes. The Alleghany stock, which had been valued at 30 at the time the notes were issued, was quoted in the market around 10–12. Morgan & Company and the Guaranty Trust Company were informed by the Van Sweringens that there would be a deficiency in the segregated assets unless they could borrow to maintain the same and for other purposes. A breach of the covenant to maintain would, of course, have been a default, accelerating the payment of the notes. On October 30, 1930, Morgan & Company, in behalf of itself and five other New York banks, entered into an agreement with the Vaness Company, 80% of the stock of which was owned by the Van Sweringens, and which, in turn, owned all of the capital stock of the Company, which, as we have already seen, owned all of the stock of the Cleveland Terminals Building Corporation. The agreement recited that to maintain the 50% of segregated assets, there had then been delivered to the Company 400,000 additional shares of Alleghany. Under that agreement with Morgan & Company $16,000,000 was loaned to the Vaness Company, and $23,500,000 to the Cleveland Terminals Corporation upon its note to the Vaness Company. In those loans, as I have said, Morgan & Company and the Guaranty Trust Company each had an $11,000,000 participation. In early 1931, the Vaness Company increased its loan to $18,100,000 by borrowing $1,500,000 from the New York Trust Company, and $600,000 from the Midland Bank of Cleveland. The collateral securing all of these loans was deposited with Morgan & Company and represented substantially all the securities and other property at the disposal of the borrowers, among others, 1,744,800 shares of common stock of the Company. All of the securities owned by the Cleveland Terminals were pledged as collateral to the payment of the separate loan made to it. It is to be noted that there is no showing that any of the property of the Company was so pledged in violation of the trust indenture. $15,000,000 of the money so borrowed was to be employed to replace the original segregated assets and the later assigned securities under the trust indenture. This was done in part by the purchase by Vaness of $10,087,000 of United States Government obligations in substitution for the 400,000 shares of Alleghany previously assigned, $5,000,000 of the money loaned to the Cleveland Corporation was used to purchase the other 500,000 shares of Alleghany stock, and there was substituted therefor in the segregated assets $4,913,000 additional of United States Government obligations, the net result being that $15,000,000 of Governments were substituted for the 900,000 shares of Alleghany stock previously held as segregated assets and assigned securities.

Thus was averted, for the time at least, a possible breach of the trust indenture. As we all know, however, the market conditions did not improve. The notes in question suffered like all other securities. The Van Sweringens took advantage of the depreciation in their market value and began buying them in at less than par. The market on the notes went down to the 30's in October 1931. The Van Sweringens could thus buy in the notes at much less than par and when the outstanding par value of the notes had been reduced to $15,000,000 all of the segregated assets and assigned securities would be released and they had the right to make these purchases out of the segregated assets and assigned securities. They actually bought in notes aggregating $3,766,000.

It also seemed improbable that the Company could meet either the interest to become due on the notes on November 1, 1931, or interest upon the bank loans, both of which aggregated over $2,000,000.

In order to protect the noteholders and to stop the purchase of the notes in this manner, or at least to place all of the noteholders on a parity in disposing of their notes, the offer now criticized was devised. From the reference previously made to the terms of the indenture, it is obvious that the segregated assets and assigned securities were not pledged as collateral to the notes and were subject to the claims of creditors in the event of bankruptcy. On October 29, 1931, the Vaness Company entered into an agreement with Morgan & Company by which they announced their intention to make an offer in the form communicated

to the plaintiff. By that agreement, payment of the interest aggregating $1,248,-000 due on November 1, 1931, upon the moneys loaned to the Cleveland Terminals Corporation and Vaness Company was deferred until May 1, 1935. An aggregate of $15,000,000 of the notes was purchased with the proceeds of the segregated assets and assigned securities. The assigned securities remaining were to be delivered to Morgan & Company as security for the loan to the Vaness Company. Morgan & Company agreed to release such number of shares of common stock of the Company as might be required, in order to carry out the terms of the offer. After $15,000,000 of the notes purchased had been retired and cancelled, the other notes purchased were, as acquired, to be substituted for the stock and assigned securities used in the acquisition of the notes. Provision was also made for the payment of interest upon the notes, partly by further borrowings and partly by the release of assigned securities.

The plaintiff complains that this agreement was not revealed. I doubt very much if it had been whether it would have made any difference to her. It is obvious that it was made for the purpose of accomplishing the very thing that plaintiff acquiesced in, and for the purpose of carrying it out. There was no fraud, breach of trust or over-reaching in the use of the segregated assets and assigned securities to pay off the notes. The trust indenture authorized that, and the method employed by the agreement assured the noteholders of equal chance with others instead of giving the opportunity to the Van Sweringens of purchasing the notes at less than one-half their face, and thus releasing the securities. The noteholders received all from those securities they were entitled to receive. There can be no complaint that the excess, if any, was used for other purposes. The trust indenture provides that the excess "shall, at the option of the Company, be no longer subject to the above restrictions, and may be used by the Company for its general corporate purposes." And, finally, the trust indenture authorized the use of the segregated assets and assigned securities in the purchase of the notes. It did not require them to be purchased at par, and it did not prevent their being purchased at less than one-half of par, in which event, more of the securities mentioned would be released than would be required to pay for the notes so purchased.

It is not to be overlooked here that neither the Guaranty Trust Company nor Morgan & Company was dealing with a trust res. There was none, and in its absence it is a matter of some doubt whether there was a real trust. Bradford v. Chase National Bank, D.C., 24 F.Supp. 28-34, affirmed Berger v. Chase Nat. Bank, 2 Cir., 105 F.2d 1001, affirmed 309 U.S. 632, 60 S. Ct. 707, 84 L.Ed. 990.

Even if we treat the segregated assets and assigned securities as a trust res, it is not shown that the defendants received any part of those securities for their personal benefit, as alleged by the plaintiff. The facts as shown by the papers are directly to the contrary. When the offer was made to the noteholders, these securities were $4,000,-000 principal amount of 1⅞% United States Treasury Certificates due December 15, 1931, and $9,413,083.01 cash. On October 31, 1931, $465,000 representing the loan which the Company had obtained from the Union Trust Company of Cleveland was credited to the account, together with $4,-115.88 representing bank interest paid by Morgan & Company. The further sum of $4,284.21, representing bank interest paid by Morgan & Company, was added on November 14, 1931. This makes an aggregate of $13,886,483.10. There were paid out of this amount $5,613,500 to the New York Trust Company for the 50% cash payment on $11,227,000 of notes exchanged under the offer, $787,290 to the Guaranty Trust Company for the interest due November 1, 1931, on the outstanding notes, $2,815.40 to Payne Weber & Company for $7,000 of notes purchased prior to October 29, 1931, and $3,482,877.70 to the Vaness Company, being the balance in the account on November 14, 1931, and there were also delivered to the latter the $4,000,000 in United States Treasury Certificates, a total of $13,886,-483.10. Out of the cash and Governments the Vaness Company continued the purchase of the notes pursuant to the offer. The Governments were sold for $4,031,769.29, and that sum, together with the $3,482,-877.70 in cash, were paid out $6,892,000 to the New York Trust Company for $13,-784,000 of notes acquired, $553,860 to Union Trust Company of Cleveland, for moneys borrowed to pay interest on the notes, $3,-000.78 to attorneys of Vaness Company, and $65,779.21 for a participation by Vaness in a loan to Higbee Company, a total of $7,514,639.99.

We can, however, assume there was a trust relation and apply the now oft-quoted statement of Chief Judge Cardozo that, "A trustee is held to something stricter than the morals of the market place", and that "Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by 'disintegrating erosion' of particular exceptions." Meinhard v. Salmon, 249 N.Y. 458, 464, 164 N.E. 545, 546, 62 A.L.R. 1. One who joins with a fiduciary in a breach of trust is also responsible. Jackson v. Smith, 254 U.S. 586, 587-589, 41 S.Ct. 200, 65 L.Ed. 418; Irving Trust Co. v. Deutsch, 2 Cir., 73 F.2d 121, certiorari denied Biddle v. Irving Trust Co., 294 U.S. 708, 55 S.Ct. 405, 79 L.Ed. 1243. There still remains the question whether there was such action on the part of the defendants which made them liable to the plaintiff. They did nothing the trust indenture forbid. They did substitute in their collateral the balance of the notes for the stock of the Company. What the stock was then worth was problematical. Both sides now admit that it was worthless, but who could then tell? In judging their acts, we must look at the facts as they existed at the time, not aided or enlightened by those which subsequently took place. Purdy v. Lynch, 145 N.Y. 462, 40 N.E. 232. A wisdom developed after an event is a standard no man should be judged by. Costello v. Costello, 209 N.Y. 252-262, 103 N.E. 148. And even if we judge by the subsequent events, it is obvious that plaintiff received more than did the defendants from the same notes. She got 50% in cash and they received about 12%. The defendants were seeking to avoid the demolition of the Van Sweringen empire for the benefit of all concerned. They insured the payment to plaintiff and others of more than the then market value of the stock. Under the circumstances as they then existed, with all the uncertainties of market conditions and with all of the future unknown and unforeseeable, against which so many allegedly great financial minds guessed wrong, was there a breach of that high degree of good faith which the law requires of a fiduciary? The Guaranty Trust Company could have said "No, we will have no part in it", which, so far as I can see, is the only position the plaintiff can take. If it had taken that position, how would it have benefited the plaintiff? The Company might have been able to finance the payment of the interest on the notes and the deposit of the assigned securities to maintain the 50% of the segregated assets, but it could also have continued its purchases of the notes in the open market at much less than was paid to the plaintiff, until the segregated assets and assigned securities were completely exhausted. Or it might have defaulted. In either event, there would have been, as there was, the final bankruptcy and the relegation of the plaintiff to her claim as a general creditor. I cannot and do not find that defendants violated any duty owing to plaintiff.

I have serious doubts as to whether or not the plaintiff's cause of action is barred by the statute of limitations. In the last analysis, her effort here is to recover the value of her notes at the time she made the exchange, less what she actually received. While the prayer of her complaint is of an equitable nature, yet she seeks practically the same relief that she might ask at law. Under such circumstances, no fraud being proven, she might be barred by the six year statute of limitations. John G. Lonsdale and James M. Kurn, Trustees of St. Louis San Francisco Ry. Co. v. James Speyer et al., 174 Misc. 532-551, 19 N.Y. S.2d 746, affirmed 259 App.Div. 802, 19 N.Y.S.2d 773, affirmed 284 N.Y. 756, 31 N. E.2d 512. Jno. Dunlop's Sons, Inc., v. Dunlop, 285 N.Y. 333, 34 N.E.2d 344. But I do not care to rest my decision on that ground.

The motion of the plaintiff for summary judgment is, therefore, denied. The motion of the defendants for summary judgment is granted.

Settle order on notice.