## GUARANTY TRUST CO. *v.* YORK.

No. 264.   Argued January 3, 4, 1945.—Decided June 18, 1945.

*Mr. John W. Davis,* with whom *Messrs. Theodore Kiendl, Ralph M. Carson* and *Francis W. Phillips* were on the brief, for petitioner.

*Mr. Meyer Abrams* for respondent.

Briefs were filed by *Solicitor General Fahy, Messrs. Roger S. Foster, Milton V. Freeman, David K. Kadane* and *Arnold R. Ginsburg* on behalf of the Securities and Exchange Commission, and by *Messrs. Carl J. Austrian* and *Saul J. Lance* on behalf of J. Cloyd Kent et al., Trustees, as *amici curiae,* urging affirmance.

MR. JUSTICE FRANKFURTER delivered the opinion of the Court.

In *Russell* v. *Todd,* 309 U. S. 280, 294, we had "no occasion to consider the extent to which federal courts, in the exercise of the authority conferred upon them by Congress to administer equitable remedies, are bound to follow state statutes and decisions affecting those remedies." The

question thus carefully left open in *Russell* v. *Todd* is now before us. It arises under the following circumstances.

In May, 1930, Van Sweringen Corporation issued notes to the amount of $30,000,000. Under an indenture of the same date, petitioner, Guaranty Trust Co., was named trustee with power and obligations to enforce the rights of the noteholders in the assets of the Corporation and of the Van Sweringen brothers. In October, 1930, petitioner, with other banks, made large advances to companies affiliated with the Corporation and wholly controlled by the Van Sweringens. In October, 1931, when it was apparent that the Corporation could not meet its obligations, Guaranty cooperated in a plan for the purchase of the outstanding notes on the basis of cash for 50% of the face value of the notes and twenty shares of Van Sweringen Corporation's stock for each $1,000 note. This exchange offer remained open until December 15, 1931.

Respondent York received $6,000 of the notes as a gift in 1934, her donor not having accepted the offer of exchange. In April, 1940, three accepting noteholders began suit against petitioner, charging fraud and misrepresentation. Respondent's application to intervene in that suit was denied, 117 F. 2d 95, and summary judgment in favor of Guaranty was affirmed. *Hackner* v. *Morgan,* 130 F. 2d 300. After her dismissal from the *Hackner* litigation, respondent, on January 22, 1942, began the present proceedings.

The suit, instituted as a class action on behalf of non-accepting noteholders and brought in a federal court solely because of diversity of citizenship, is based on an alleged breach of trust by Guaranty in that it failed to protect the interests of the noteholders in assenting to the exchange offer and failed to disclose its self-interest when sponsoring the offer. Petitioner moved for summary judgment, which was granted, upon the authority of the *Hackner* case. On appeal, the Circuit Court of Appeals, one Judge dissenting,

found that the *Hackner* decision did not foreclose this suit, and held that in a suit brought on the equity side of a federal district court that court is not required to apply the State statute of limitations that would govern like suits in the courts of a State where the federal court is sitting even though the exclusive basis of federal jurisdiction is diversity of citizenship. 143 F. 2d 503. The importance of the question for the disposition of litigation in the federal courts led us to bring the case here. 323 U. S. 693.

In view of the basis of the decision below, it is not for us to consider whether the New York statute would actually bar this suit were it brought in a State court. Our only concern is with the holding that the federal courts in a suit like this are not bound by local law.

We put to one side the considerations relevant in disposing of questions that arise when a federal court is adjudicating a claim based on a federal law. See, for instance, *Board of Comm'rs* v. *United States*, 308 U. S. 343; *Deitrick* v. *Greaney*, 309 U. S. 190; *D'Oench, Duhme & Co.* v. *F. D. I. C.*, 315 U. S. 447; *Clearfield Trust Co.* v. *United States*, 318 U. S. 363; *O'Brien* v. *Western Union Telegraph Co.*, 113 F. 2d 539. Our problem only touches transactions for which rights and obligations are created by one of the States, and for the assertion of which, in case of diversity of the citizenship of the parties, Congress has made a federal court another available forum.

Our starting point must be the policy of federal jurisdiction which *Erie R. Co.* v. *Tompkins,* 304 U. S. 64, embodies. In overruling *Swift* v. *Tyson,* 16 Pet. 1, *Erie R. Co.* v. *Tompkins* did not merely overrule a venerable case. It overruled a particular way of looking at law which dominated the judicial process long after its inadequacies had been laid bare. See, *e. g.,* Field, J., dissenting in *Baltimore & Ohio R. Co.* v. *Baugh,* 149 U. S. 368, 391; Holmes, J., dissenting in *Kuhn* v. *Fairmont Coal Co.,* 215 U. S. 349,

370, and in *Black & White Taxi. Co. v. Brown & Yellow Taxi. Co.*, 276 U. S. 518, 532; *Erie R. Co. v. Tompkins*, *supra* at 73, note 6. Law was conceived as a "brooding omnipresence" of Reason, of which decisions were merely evidence and not themselves the controlling formulations. Accordingly, federal courts deemed themselves free to ascertain what Reason, and therefore Law, required wholly independent of authoritatively declared State law, even in cases where a legal right as the basis for relief was created by State authority and could not be created by federal authority and the case got into a federal court merely because it was "between Citizens of different States" under Art. III, § 2 of the Constitution of the United States.

This impulse to freedom from the rules that controlled State courts regarding State-created rights was so strongly rooted in the prevailing views concerning the nature of law, that the federal courts almost imperceptibly were led to mutilating construction even of the explicit command given to them by Congress to apply State law in cases purporting to enforce the law of a State. See § 34 of the Judiciary Act of 1789, 1 Stat. 73, 92. The matter was fairly summarized by the statement that "During the period when *Swift v. Tyson* (1842–1938) ruled the decisions of the federal courts, its theory of their freedom in matters of general law from the authority of state courts pervaded opinions of this Court involving even state statutes or local law." *Vandenbark v. Owens-Illinois Co.*, 311 U. S. 538, 540.

In relation to the problem now here, the real significance of *Swift v. Tyson* lies in the fact that it did not enunciate novel doctrine. Nor was it restricted to its particular situation. It summed up prior attitudes and expressions in cases that had come before this Court and lower federal courts for at least thirty years, at law as well as in equity.[1]

---

[1] In *Russell v. Southard*, 12 How. 139, 147, Mr. Justice Curtis, refusing to be bound by Kentucky law barring the reception of oral

The short of it is that the doctrine was congenial to the jurisprudential climate of the time. Once established, judicial momentum kept it going. Since it was conceived that there was "a transcendental body of law outside of any particular State but obligatory within it unless and until changed by statute," 276 U. S. 518, 532, 533, State court decisions were not "the law" but merely someone's opinion—to be sure an opinion to be respected—concerning the content of this all-pervading law. Not unnaturally, the federal courts assumed power to find for themselves the content of such a body of law. The notion was stimulated by the attractive vision of a uniform body of federal law. To such sentiments for uniformity of decision and freedom from diversity in State law the federal courts gave currency, particularly in cases where equitable remedies were sought, because equitable doctrines are so often cast in terms of universal applicability when close analysis of the source of legal enforceability is not demanded.

In exercising their jurisdiction on the ground of diversity of citizenship, the federal courts, in the long course of their history, have not differentiated in their regard for State law between actions at law and suits in equity. Although § 34 of the Judiciary Act of 1789, 1 Stat. 73, 92, 28 U. S. C. § 725, directed that the "laws of the several states . . . shall be regarded as rules of decision in trials at common law . . . ," this was deemed, consistently for over a hundred years, to be merely declaratory of what would in

---

evidence to show that an absolute bill of sale was in reality a mortgage, declared that "upon the principles of general equity jurisprudence, this court must be governed by its own views of those principles." To support this statement, he cited, among others, *Robinson* v. *Campbell,* 3 Wheat. 212, *Boyle* v. *Zacharie and Turner,* 6 Pet. 648, and *Swift* v. *Tyson, supra.* This commingling of law and equity cases indicates that the same views governed both and that *Swift* v. *Tyson* was merely another expression of the ideas put forth in the equity cases.

any event have governed the federal courts and therefore was equally applicable to equity suits.[2] See *Hawkins* v. *Barney's Lessee,* 5 Pet. 457, 464; *Mason* v. *United States,* 260 U. S. 545, 559; *Erie R. Co.* v. *Tompkins, supra* at 72. Indeed, it may fairly be said that the federal courts gave greater respect to State-created "substantive rights," *Pusey & Jones Co.* v. *Hanssen,* 261 U. S. 491, 498, in equity than they gave them on the law side, because rights at law were usually declared by State courts and as such increasingly flouted by extension of the doctrine of *Swift* v. *Tyson,* while rights in equity were frequently defined by legislative enactment and as such known and respected by the federal courts. See, *e. g., Clark* v. *Smith,* 13 Pet. 195; *Scott* v. *Neely,* 140 U. S. 106; *Louisville & Nashville R. Co.* v. *Western Union Co.,* 234 U. S. 369, 374–76; *Pusey & Jones Co.* v. *Hanssen, supra* at 498.

Partly because the States in the early days varied greatly in the manner in which equitable relief was afforded and in the extent to which it was available, see, *e. g.,* Fisher, The Administration of Equity Through Common Law Forms (1885) 1 L. Q. Rev. 455; Woodruff, Chancery in Massachusetts (1889) 5 L. Q. Rev. 370; Laussat, Essay on Equity in Pennsylvania (1826), Congress provided that "the forms and modes of proceeding in suits . . . of eq-

---

[2] In *Bank of Hamilton* v. *Dudley's Lessee,* 2 Pet. 492, 525, Chief Justice Marshall, in discussing the applicability of Ohio occupant law as "rules of decision" under § 34, said, "The laws of the states, and the occupant law, like others, would be so regarded, independent of that special enactment. . . ." It is interesting to note that this judicial pronouncement corresponds to the views John Marshall expressed in the Virginia Convention called to ratify the Constitution. Responding to George Mason's question as to what law would apply in the federal courts in diversity cases, Marshall declared: "By the laws of which state will it be determined? said he. By the laws of the state where the contract was made. According to those laws, and those only, can it be decided. Is this a novelty? No; it is a principle in the jurisprudence of this commonwealth." 3 Elliott's Debates, 556.

uity" would conform to the settled uses of courts of equity. § 2, 1 Stat. 275, 276, 28 U. S. C. § 723. But this enactment gave the federal courts no power that they would not have had in any event when courts were given "cognizance," by the first Judiciary Act, of suits "in equity." From the beginning there has been a good deal of talk in the cases that federal equity is a separate legal system. And so it is, properly understood. The suits in equity of which the federal courts have had "cognizance" ever since 1789 constituted the body of law which had been transplanted to this country from the English Court of Chancery. But this system of equity "derived its doctrines, as well as its powers, from its mode of giving relief." Langdell, Summary of Equity Pleading (1877) xxvii. In giving federal courts "cognizance" of equity suits in cases of diversity jurisdiction, Congress never gave, nor did the federal courts ever claim, the power to deny substantive rights created by State law or to create substantive rights denied by State law.

This does not mean that whatever equitable remedy is available in a State court must be available in a diversity suit in a federal court, or conversely, that a federal court may not afford an equitable remedy not available in a State court. Equitable relief in a federal court is of course subject to restrictions: the suit must be within the traditional scope of equity as historically evolved in the English Court of Chancery, *Payne* v. *Hook,* 7 Wall. 425, 430; *Atlas Ins. Co.* v. *Southern, Inc.,* 306 U. S. 563, 568; *Sprague* v. *Ticonic Bank,* 307 U. S. 161, 164–165; a plain, adequate and complete remedy at law must be wanting, § 16, 1 Stat. 73, 82, 28 U. S. C. § 384; explicit Congressional curtailment of equity powers must be respected, see, *e. g.,* Norris-LaGuardia Act, 47 Stat. 70, 29 U. S. C. § 101 *et seq.;* the constitutional right to trial by jury cannot be evaded, *Whitehead* v. *Shattuck,* 138 U. S. 146. That a State may authorize its courts to give equitable relief unhampered

by any or all such restrictions cannot remove these fetters from the federal courts. See *Clark* v. *Smith, supra* at 203; *Broderick's Will*, 21 Wall. 503, 519–20; *Louisville & Nashville R. Co.* v. *Western Union Co., supra* at 376; *Henrietta Mills* v. *Rutherford Co.*, 281 U. S. 121, 127–28; *Atlas Ins. Co.* v. *Southern, Inc., supra* at 568–70. State law cannot define the remedies which a federal court must give simply because a federal court in diversity jurisdiction is available as an alternative tribunal to the State's courts.[3] Contrariwise, a federal court may afford an equitable remedy for a substantive right recognized by a State even though a State court cannot give it. Whatever contradiction or confusion may be produced by a medley of judicial phrases severed from their environment, the body of adjudications concerning equitable relief in diversity cases leaves no doubt that the federal courts enforced State-created substantive rights if the mode of proceeding and remedy were consonant with the traditional body of equitable remedies, practice and procedure, and in so doing

---

[3] In *Pusey & Jones Co.* v. *Hanssen, supra*, the Court had to decide whether a Delaware statute had created a new right appropriate for enforcement in accordance with traditional equity practice or whether the statute had merely given the Delaware Chancery Court a new kind of remedy. The statute authorized the Chancellor to appoint a receiver for an insolvent corporation upon the application of an unsecured simple contract creditor. Suit was brought in a federal equity court under diversity jurisdiction. Although traditional equity notions do not give a simple contract creditor an interest in the funds of an insolvent debtor, the State may, as this Court recognized, create such an interest. When the State has done that, whatever remedies are consonant with the practice of equity courts in effectuating creditor's rights come into play. *Pusey & Jones Co.* v. *Hanssen, supra*, did not question that in the case of diversity jurisdiction the States create the obligation for which relief is sought. But the Court construed the Delaware statute merely to extend the power to an equity court to appoint a receiver on the application of an ordinary contract creditor. By conferring new discretionary authority upon its equity court, Delaware could not modify the traditional equity rule in the federal

they were enforcing rights created by the States and not arising under any inherent or statutory federal law.[4]

Inevitably, therefore, the principle of *Erie R. Co.* v. *Tompkins,* an action at law, was promptly applied to a suit in equity. *Ruhlin* v. *N. Y. Life Ins. Co.,* 304 U. S. 202.

And so this case reduces itself to the narrow question whether, when no recovery could be had in a State court because the action is barred by the statute of limitations, a federal court in equity can take cognizance of the suit because there is diversity of citizenship between the parties. Is the outlawry, according to State law, of a claim created by the States a matter of "substantive rights" to be respected by a federal court of equity when that court's jurisdiction is dependent on the fact that there is a State-

---

courts that only someone with a defined interest in the estate of an insolvent person, *e. g.,* a judgment creditor, can protect that interest through receivership. But the Court recognized that if the Delaware statute had been one not regulating the powers of the Chancery Court of Delaware but creating a new interest in a contract creditor, the federal court would have had power to grant a receivership at the behest of such a simple contract creditor, as much so as in the case of a secured creditor. See *Mackenzie Oil Co.* v. *Omar Oil & Gas Co.,* 14 Del. Ch. 36, 45, 120 A. 852, for Delaware's view as to the nature of the Delaware statute.

[4] "It is true that where a state statute creates a new equitable right of a substantive character, which can be enforced by proceedings in conformity with the pleadings and practice appropriate to a court of equity, such enforcement may be had in a Federal court provided a ground exists for invoking the Federal jurisdiction. . . . But the enforcement in the Federal courts of new equitable rights created by States is subject to the qualification that such enforcement must not impair any right conferred, or conflict with any inhibition imposed, by the Constitution or laws of the United States. . . . Whatever uncertainty may have arisen because of expressions which did not fully accord with the rule as thus stated, the distinction, with respect to the effect of state legislation, has come to be clearly established between substantive and remedial rights." *Henrietta Mills* v. *Rutherford Co., supra* at 127–128.

created right, or is such statute of "a mere remedial character," *Henrietta Mills* v. *Rutherford Co., supra* at 128, which a federal court may disregard?

Matters of "substance" and matters of "procedure" are much talked about in the books as though they defined a great divide cutting across the whole domain of law. But, of course, "substance" and "procedure" are the same keywords to very different problems. Neither "substance" nor "procedure" represents the same invariants. Each implies different variables depending upon the particular problem for which it is used. See *Home Ins. Co.* v. *Dick,* 281 U. S. 397, 409. And the different problems are only distantly related at best, for the terms are in common use in connection with situations turning on such different considerations as those that are relevant to questions pertaining to *ex post facto* legislation, the impairment of the obligations of contract, the enforcement of federal rights in the State courts and the multitudinous phases of the conflict of laws. See, *e. g., American Railway Express Co.* v. *Levee,* 263 U. S. 19, 21; *Davis* v. *Wechsler,* 263 U. S. 22, 24–25; *Worthen Co.* v. *Kavanaugh,* 295 U. S. 56, 60; *Garrett* v. *Moore-McCormack Co.,* 317 U. S. 239, 248–49; and see Tunks, Categorization and Federalism: "Substance" and "Procedure" After Erie Railroad v. Tompkins (1939) 34 Ill. L. Rev. 271, 274–276; Cook, Logical and Legal Bases of Conflict of Laws (1942) 163–165.

Here we are dealing with a right to recover derived not from the United States but from one of the States. When, because the plaintiff happens to be a non-resident, such a right is enforceable in a federal as well as in a State court, the forms and mode of enforcing the right may at times, naturally enough, vary because the two judicial systems are not identic. But since a federal court adjudicating a State-created right solely because of the diversity of citizenship of the parties is for that purpose, in effect, only another court of the State, it cannot afford recovery

if the right to recover is made unavailable by the State nor can it substantially affect the enforcement of the right as given by the State.

And so the question is not whether a statute of limitations is deemed a matter of "procedure" in some sense. The question is whether such a statute concerns merely the manner and the means by which a right to recover, as recognized by the State, is enforced, or whether such statutory limitation is a matter of substance in the aspect that alone is relevant to our problem, namely, does it significantly affect the result of a litigation for a federal court to disregard a law of a State that would be controlling in an action upon the same claim by the same parties in a State court?

It is therefore immaterial whether statutes of limitation are characterized either as "substantive" or "procedural" in State court opinions in any use of those terms unrelated to the specific issue before us. *Erie R. Co.* v. *Tompkins* was not an endeavor to formulate scientific legal terminology. It expressed a policy that touches vitally the proper distribution of judicial power between State and federal courts. In essence, the intent of that decision was to insure that, in all cases where a federal court is exercising jurisdiction solely because of the diversity of citizenship of the parties, the outcome of the litigation in the federal court should be substantially the same, so far as legal rules determine the outcome of a litigation, as it would be if tried in a State court. The nub of the policy that underlies *Erie R. Co.* v. *Tompkins* is that for the same transaction the accident of a suit by a non-resident litigant in a federal court instead of in a State court a block away should not lead to a substantially different result. And so, putting to one side abstractions regarding "substance" and "procedure," we have held that in diversity cases the federal courts must follow the law of the State as to burden of proof, *Cities Service Co.* v. *Dunlap,* 308 U. S. 208, as to conflict of laws, *Klaxon Co.* v. *Stentor Co.,*

313 U. S. 487, as to contributory negligence, *Palmer* v. *Hoffman*, 318 U. S. 109, 117. And see *Sampson* v. *Channell*, 110 F. 2d 754. *Erie R. Co.* v. *Tompkins* has been applied with an eye alert to essentials in avoiding disregard of State law in diversity cases in the federal courts. A policy so important to our federalism must be kept free from entanglements with analytical or terminological niceties.

Plainly enough, a statute that would completely bar recovery in a suit if brought in a State court bears on a State-created right vitally and not merely formally or negligibly. As to consequences that so intimately affect recovery or non-recovery a federal court in a diversity case should follow State law. See Morgan, Choice of Law Governing Proof (1944) 58 Harv. L. Rev. 153, 155–158. The fact that under New York law a statute of limitations might be lengthened or shortened, that a security may be foreclosed though the debt be barred, that a barred debt may be used as a set-off, are all matters of local law properly to be respected by federal courts sitting in New York when their incidence comes into play there.[5] Such particular rules of local law, however, do not in the slightest change the crucial consideration that if a plea of the statute of limitations would bar recovery in a State court, a federal court ought not to afford recovery.

Prior to *Erie R. Co.* v. *Tompkins* it was not necessary, as we have indicated, to make the critical analysis required by the doctrine of that case of the nature of jurisdiction of the federal courts in diversity cases. But even before *Erie R. Co.* v. *Tompkins*, federal courts relied on statutes of limitations of the States in which they sat. In suits at

---

[5] See, *e. g.*, *Hulbert* v. *Clark*, 128 N. Y. 295, 28 N. E. 638; *House* v. *Carr*, 185 N. Y. 453, 78 N. E. 171; *Lightfoot* v. *Davis*, 198 N. Y. 261, 91 N. E. 582; *Davidson* v. *Witthaus*, 106 App. Div. 182, 94 N. Y. S. 428; *Matter of Ewald*, 174 Misc. 939, 22 N. Y. S. 2d 299. The statute may be waived, *Peoples Trust Co.* v. *O'Neil*, 273 N. Y. 312, 316, 237 N. Y. S. 180, and must be pleaded, *Dunkum* v. *Maceck Building Corp.*, 227 App. Div. 230, 7 N. E. 2d 244.

law State limitations statutes were held to be "rules of decision" within § 34 of the Judiciary Act of 1789 and as such applied in "trials at common law." *M'Cluny* v. *Sullivan*, 3 Pet. 270; *Bank of Alabama* v. *Dalton*, 9 How. 522; *Leffingwell* v. *Warren*, 2 Black 599; *Bauserman* v. *Blunt*, 147 U. S. 647. While there was talk of freedom of equity from such State statutes of limitations, the cases generally refused recovery where suit was barred in a like situation in the State courts, even if only by way of analogy. See, *e. g., Godden* v. *Kimmell*, 99 U. S. 201; *Alsop* v. *Riker*, 155 U. S. 448; *Benedict* v. *City of New York*, 250 U. S. 321, 327–328. However in *Kirby* v. *Lake Shore & M. S. R. Co.*, 120 U. S. 130, the Court disregarded a State statute of limitations where the Court deemed it inequitable to apply it.

To make an exception to *Erie R. Co.* v. *Tompkins* on the equity side of a federal court is to reject the considerations of policy which, after long travail, led to that decision. Judge Augustus N. Hand thus summarized below the fatal objection to such inroad upon *Erie R. Co.* v. *Tompkins:* "In my opinion it would be a mischievous practice to disregard state statutes of limitation whenever federal courts think that the result of adopting them may be inequitable. Such procedure would promote the choice of United States rather than of state courts in order to gain the advantage of different laws. The main foundation for the criticism of *Swift* v. *Tyson* was that a litigant in cases where federal jurisdiction is based only on diverse citizenship may obtain a more favorable decision by suing in the United States courts." 143 F. 2d 503, 529, 531.

Diversity jurisdiction is founded on assurance to nonresident litigants of courts free from susceptibility to potential local bias. The Framers of the Constitution, according to Marshall, entertained "apprehensions" lest distant suitors be subjected to local bias in State courts, or, at least, viewed with "indulgence the possible fears and apprehensions" of such suitors. *Bank of the United States*

v. *Deveaux,* 5 Cranch 61, 87. And so Congress afforded out-of-State litigants another tribunal, not another body of law. The operation of a double system of conflicting laws in the same State is plainly hostile to the reign of law. Certainly, the fortuitous circumstance of residence out of a State of one of the parties to a litigation ought not to give rise to a discrimination against others equally concerned but locally resident. The source of substantive rights enforced by a federal court under diversity jurisdiction, it cannot be said too often, is the law of the States. Whenever that law is authoritatively declared by a State, whether its voice be the legislature or its highest court, such law ought to govern in litigation founded on that law, whether the forum of application is a State or a federal court and whether the remedies be sought at law or may be had in equity.

Dicta may be cited characterizing equity as an independent body of law. To the extent that we have indicated, it is. But insofar as these general observations go beyond that, they merely reflect notions that have been replaced by a sharper analysis of what federal courts do when they enforce rights that have no federal origin. And so, before the true source of law that is applied by the federal courts under diversity jurisdiction was fully explored, some things were said that would not now be said. But nothing that was decided, unless it be the *Kirby* case, needs to be rejected.

The judgment is reversed and the case is remanded for proceedings not inconsistent with this opinion.

*So ordered.*

MR. JUSTICE ROBERTS and MR. JUSTICE DOUGLAS took no part in the consideration or decision of this case.

MR. JUSTICE RUTLEDGE.

I dissent. If the policy of judicial conservatism were to be followed in this case, which forbids deciding constitu-

tional and other important questions hypothetically or prematurely, I would favor remanding the cause to the Court of Appeals for determination of the narrow and comparatively minor question whether, under the applicable local law, the cause of action has been barred by lapse of time. That question has not been decided,[1] may be determined in respondent's favor, and in that event the important question affecting federal judicial power now resolved, in a manner contrary to all prior decision here, will have been determined without substantial ultimate effect upon the litigation.[2]

But the Court conceives itself confronted with the necessity for making that determination and in doing so overturns a rule of decision which has prevailed in the federal courts from almost the beginning. I am unable to assent to that decision, for reasons stated by the Court of Appeals [3] and others to be mentioned only briefly. One may give full adherence to the rule of *Erie R. Co.* v. *Tompkins*, 304 U. S. 64, and its extension to cases in equity in so far as they affect clearly substantive rights, without conceding or assuming that the long tradition, both federal and state, which regards statutes of limitations as falling within the category of remedial rather than substantive law, necessarily must be ruled in the same way; and without conceding further that only a different jurisprudential climate or a kind of "brooding omnipresence in the sky"

[1] The Court of Appeals only assumed *arguendo* that the local statute of limitations had terminated the right to sue. 143 F. 2d 503.

[2] An inferior court, of course, is free to select one or more of several available grounds upon which to rest its decision; and generally, on review here, our function should be performed by passing upon the grounds chosen. But there are circumstances in which it is proper to vacate the judgment and remand the cause for consideration of other issues presented. Cf. e. g., the recent instance of *Herb* v. *Pitcairn*, 324 U. S. 117; 325 U. S. 77.

[3] 143 F. 2d 503. The court's opinion reviews at length the unbroken course of decision now overturned.

has dictated the hitherto unvaried policy of the federal courts in their general attitude toward the strict application of local statutes of limitations in equity causes.

If any characteristic of equity jurisprudence has descended unbrokenly from and within "the traditional scope of equity as historically evolved in the English Court of Chancery," it is that statutes of limitations, often in terms applying only to actions at law, have never been deemed to be rigidly applicable as absolute barriers to suits in equity as they are to actions at law.[4] That tradition, it would seem, should be regarded as having been incorporated in the various Acts of Congress which have conferred equity jurisdiction upon the federal courts. So incorporated, it has been reaffirmed repeatedly by the decisions of this and other courts.[5] It is now excised from those Acts. If there is to be excision, Congress, not this Court, should make it.

Moreover, the decision of today does not in so many words rule that Congress could not authorize the federal courts to administer equitable relief in accordance with the substantive rights of the parties, notwithstanding state courts had been forbidden by local statutes of limitations to do so. Nevertheless the implication to that effect seems strong, in view of the reliance upon *Erie R. Co.* v. *Tompkins.*[6] In any event, the question looms more largely in the issues than the Court's opinion appears to

---

[4] *Michoud* v. *Girod,* 4 How. 503, 561; *Meader* v. *Norton,* 11 Wall. 442; *Bailey* v. *Glover,* 21 Wall. 342, 348; *Kirby* v. *Lake Shore & M. S. R. Co.,* 120 U. S. 130.

[5] See the authorities cited and discussed, 143 F. 2d 503, 522–524. See also *Committee for Holders* v. *Kent,* 143 F. 2d 684, 687; *Overfield* v. *Pennroad Corp.,* 146 F. 2d 889, 901, 921–923.

[6] In the *Erie* case the Court said: "If only a question of statutory construction were involved, we should not be prepared to abandon a doctrine so widely applied throughout nearly a century. But the unconstitutionality of the course pursued has now been made clear and compels us to do so." 304 U. S. 64, 77–78.

make it. For if legislative acquiescence in long-established judicial construction can make it part of a statute, it has done so in this instance. More is at stake in the implications of the decision, if not in the words of the opinion, than simply bringing federal and local law into accord upon matters clearly and exclusively within the constitutional power of the state to determine. It is one thing to require that kind of an accord in diversity cases when the question is merely whether the federal court must follow the law of the state as to burden of proof, *Cities Service Co.* v. *Dunlap,* 308 U. S. 208; contributory negligence, *Palmer* v. *Hoffman,* 318 U. S. 109, 117; or perhaps in application of the so-called parol evidence rule. These ordinarily involve matters of substantive law, though nominated in terms of procedure. But in some instances their application may lie along the border between procedure or remedy and substance, where the one may or may not be in fact but another name for the other. It is exactly in this borderland, where procedural or remedial rights may or may not have the effect of determining the substantive ones completely, that caution is required in extending the rule of the *Erie* case by the very rule itself.

The words "substantive" and "procedural" or "remedial" are not talismanic. Merely calling a legal question by one or the other does not resolve it otherwise than as a purely authoritarian performance. But they have come to designate in a broad way large and distinctive legal domains within the greater one of the law and to mark, though often indistinctly or with overlapping limits, many divides between such regions.

One of these historically has been the divide between the substantive law and the procedural or remedial law to be applied by the federal courts in diversity cases, a division sharpened but not wiped out by *Erie R. Co.* v. *Tompkins* and subsequent decisions extending the scope

of its ruling. The large division between adjective law and substantive law still remains, to divide the power of Congress from that of the states and consequently to determine the power of the federal courts to apply federal law or state law in diversity matters.

This division, like others drawn by the broad allocation of adjective or remedial and substantive, has areas of admixture of these two aspects of the law. In these areas whether a particular situation or issue presents one aspect or the other depends upon how one looks at the matter. As form cannot always be separated from substance in a work of art, so adjective or remedial aspects cannot be parted entirely from substantive ones in these borderland regions.

Whenever this integration or admixture prevails in a substantial measure, so that a clean break cannot be made, there is danger either of nullifying the power of Congress to control not only how the federal courts may act, but what they may do by way of affording remedies, or of usurping that function, if the *Erie* doctrine is to be expanded judicially to include such situations to the utmost extent.

It may be true that if the matter were wholly fresh the barring of rights in equity by statutes of limitation would seem to partake more of the substantive than of the remedial phase of law. But the matter is not fresh and it is not without room for debate. A long tradition, in the states and here, as well as in the common law which antedated both state and federal law, has emphasized the remedial character of statutes of limitations, more especially in application to equity causes, on many kinds of issues requiring differentiation of such matters from more clearly and exclusively substantive ones. We have recently reaffirmed the distinction in relation to the power of a state to change its laws with retroactive effect, giving renewed vigor if not new life to *Campbell* v. *Holt*, 115

U. S. 620. *Chase Securities Corp.* v. *Donaldson,* 325 U. S. 304. Similar, though of course not identical, arguments were advanced in that case to bring about departure from the long-established rule, but without success. The tradition now in question is equally long and unvaried. I cannot say the tradition is clearly wrong in this case more than in that. Nor can I say, as was said in the *Erie* case, that the matter is beyond the power of Congress to control. If that be conceded, I think Congress should make the change if it is to be made. The *Erie* decision was rendered in 1938. Seven years have passed without action by Congress to extend the rule to these matters. That is long enough to justify the conclusion that Congress also regards them as not governed by *Erie* and as wishing to make no change. This should be reason enough for leaving the matter at rest until it decides to act.

Finally, this case arises from what are in fact if not in law interstate transactions.[7] It involves the rights of security holders in relation to securities which were distributed not in New York or Ohio alone but widely throughout the country. They are the kind of rights which Congress acted to safeguard when it adopted the Securities and Exchange legislation.[8] Specific provisions of that legislation are not involved in this litigation. The broad policies underlying it may be involved or affected,

---

[7] Reference is made to the opinion of the Court of Appeals for a detailed statement of the nature and scope of the intricate and elaborate financial transactions, involving the distribution of $30,000,000 worth of securities, apparently in many states, including Ohio and New York, and rights growing out of the distribution. 143 F. 2d at 505 *et seq.* See also *Eastman* v. *Morgan,* 43 F. Supp. 637, aff'd *sub nom. Hackner* v. *Morgan,* 130 F. 2d 300, cert. denied, 317 U. S. 691.

[8] Cf. S. Rep. No. 714, 77th Cong., 1st Sess., Additional Report of Committee on Interstate Commerce pursuant to S. Res. 71, 74th Cong., pts. 1–4. See also Stock Exchange Practices, Hearings before Committee on Banking and Currency on S. Res. 84, 72d Cong. and S. Res. 56 and 97, 73d Cong.

namely, by the existence of adequate federal remedies, whether judicial or legislative, for the protection of security holders against the misconduct of issuers or against the breach of rights by trustees. Even though the basic rights may be controlled by state law, in such situations the question is often a difficult one whether the law of one state or another applies; and this is true not only of rights clearly substantive but also of those variously characterized as procedural or remedial and substantive which involve the application of statutes of limitations.

Applicable statutes of limitations in state tribunals are not always the ones which would apply if suit were instituted in the courts of the state which creates the substantive rights for which enforcement is sought. The state of the forum is free to apply its own period of limitations, regardless of whether the state originating the right has barred suit upon it.[9] Whether or not *the action* will be held to be barred depends therefore not upon the law of the state which creates the substantive right, but upon the law of the state where suit may be brought. This in turn will depend upon where it may be possible to secure service of process, and thus jurisdiction of the person of the defendant. It may be therefore that because of the plaintiff's inability to find the defendant in the jurisdiction which creates his substantive right, he will be foreclosed of remedy by the sheer necessity of going to the haven of refuge within which the defendant confines its "presence" for jurisdictional purposes. The law of the latter may bar the suit even though suit still would be allowed under the law of the state creating the substantive right.

It is not clear whether today's decision puts it into the power of corporate trustees, by confining their jurisdictional "presence" to states which allow their courts to give equitable remedies only within short periods of time, to

[9] 3 Beale, Conflict of Laws (1935 ed.) 1620, 1621; Goodrich, Conflict of Laws (1938 ed.) 201, 202.

defeat the purpose and intent of the law of the state creating the substantive right. If so, the "right" remains alive, with full-fledged remedy, by the law of its origin, and because enforcement must be had in another state, which affords refuge against it, the remedy and with it the right are nullified. I doubt that the Constitution of the United States requires this, or that the Judiciary Acts permit it. A good case can be made, indeed has been made, that the diversity jurisdiction was created to afford protection against exactly this sort of nullifying state legislation.[10]

In my judgment this furnishes added reason for leaving any change, if one is to be made, to the judgment of Congress. The next step may well be to say that in applying the doctrine of laches a federal court must surrender its own judgment and attempt to find out what a state court sitting a block away would do with that notoriously amorphous doctrine.

MR. JUSTICE MURPHY joins in this opinion.

---

[10] Frankfurter, Distribution of Judicial Power Between United States and State Courts (1928) 13 Corn. L. Q. 499, 520. See Corwin, The Progress of Constitutional Theory (1925) 30 Am. Hist. Rev. 511, 514. See also Friendly, The Historic Basis of Diversity Jurisdiction (1928) 41 Harv. L. Rev. 483, 495–497. That the motivating desire was or may have been to protect creditors who were men of business does not make the policy less applicable when the creditor is a customer of such men.