Mr. Justice Harlan,
concurring in the judgment.
My initial view of this case was that the Court of Appeals was correct in dismissing the complaint, but for reasons stated in this opinion I am now persuaded to the contrary. Accordingly, I join in the judgment of reversal.
Petitioner alleged, in his suit in the District Court- for the Eastern District of New York, that the defendants, federal agents acting under color of federal law, subjected him to a. search and seizure contravening thé requirements of the Fourth Amendment. He sought damages in the amount of $15,000 from each of the agents. Federal jurisdiction was claimed, inter alia,[1] under 28 U. S. C. § 1331 (a) which provides:
“The district courts shall have original jurisdiction of all civil actions wherein the matter in controversy exceeds the sum or value of $10,000 exclusive of interest and costs, and arises under the Constitution, laws, or treaties of the United States.”
The District Court dismissed the complaint for lack of federal jurisdiction under 28 U. S. C. § 1331 (a) and failure to state a claim for which relief may be granted. 276 F. Supp 12 (EDNY 1967). On appeal, the Court of Appeals concluded, on the basis of this Court’s decision in Bell v. Hood, 327 U. S. 678 (1946), that petitioner’s claim for damages did “[arise] under the Constitution” *399 within the meaning of 28 U. S. C. § 1331 (a); but the District Court’s judgment was affirmed on the ground that the complaint failed to state a claim for which relief can be granted. 409 F. 2d 718 (CA2 1969).
In so concluding, Chief Judge Lumbard’s opinion reasoned, in essence, that: (1) the framers of the Fourth Amendment did not appear to contemplate a “wholly new federal cause of action founded directly on the Fourth Amendment,” id., at 721, apd (2) while the federal courts had power , under a general grant of jurisdiction to imply a federal remedy for the enforcement of a constitutional right, they should do so only when the absence of alternative remedies renders the constitutional command a “mere ‘form of words.’ ” Id., at 723. The Government takes essentially the same position here. Brief for Respondents 4-5. And two members of the Court add the contention that we lack the constitutional power to accord Bivens a remedy for damages in the absence of congressional action creating “a federal cause of action for damages for an unreasonable search in violation of the Fourth Amendment.” Opinion of Mr. Justice Black, post, at 427; see also opinion of The Chief Justice, post, at 418, 422.
For the reasons set forth below, I am of the opinion that federal courts do have the power to award damages for violation of “constitutionally protected interests” and I agree with the Court that a traditional judicial remedy such as damages is appropriate to the vindication of the personal interests protected by the Fourth Amendment.
I
I turn first to the contention that the constitutional power of federal courts to accord Bivens damages for his claim depends on the passage of a statute creating a “federal cause of action.” Although the point is not *400 entirely free of ambiguity,[2] I do not understand either the Govérnment or my dissenting Brothers to maintain that Bivens’ contention that he is entitled to be free from the type of official conduct prohibited by the Fourth Amendment depends on a decision by the State in which ' hp resides to accord him a remedy. Such a position Would be incompatible with the presumed availability of federal equitable relief, if a proper showing can be made in terms of the ordinary principles governing equitable remedies. See Bell v. Hood, 327 U. S. 678, 684 (1946). However broad a federal court’s discretion concerning equitable remedies, it is absolutely clear — at least after Erie R. Co. v. Tompkins, 304 U. S. 64 (1938) — that in a nondiversity suit a federal court’s power to grant even equitable relief depends on the presence of a substantive right derived from federal law. Compare Guaranty Trust Co. v. York, 326 U. S. 99, 105-107 (1945), with Holmberg v. Armbrecht, 327 U. S. 392, 395 (1946). See also H. Hart & H. Wechsler, The Federal Courts and the Federal System 818-819 (1953).
Thus the interest which Bivens claims — to be free from official conduct in contravention of the Fourth Amendment — is a federally protected interest. See generally Katz, The Jurisprudence of Remedies: Constitutional Legality and the Law of Torts in Bell v. Hood, 117 U. Pa. L. Rev. 1, 33-34 (1968).[3] Therefore, the question *401 of-judicial power to grant Bivens damages is not a problem of the “source” of the “right”; instead, the question is whether the power to authorize damages as a judicial *402 remedy for the vindication of a federal constitutional right is placed by the' Constitution itself exclusively in Congress’ hands.
II
The contention that the federal courts are powerless to accord a litigant damages for a claimed invasion of his federal constitutional rights until Congress explicitly authorizes the remedy cannot rest on the notion that the decision to grant compensatory relief involves a resolution of policy considerations not susceptible of judicial discernment. Thus, in suits for damages based on violations of federal statutes lacking any express authorization of a damage remedy, this Court has authorized such relief where, in its view, damages are necessary to effectuate the congressional policy, underpinning the substantive provisions of the statute. J. I. Case Co. v. Borak, 377 U. S. 426 (1964); Tunstall v. Brotherhood of Locomotive Firemen & Enginemen, 323 U. S. 210, 213 (1944). Cf. Wyandotte Transportation Co. v. United States, 389 U. S. 191, 201-204 (1967).[4]
*403 If it is not the nature of the remedy which is thought to render a judgment as to the appropriateness of damages inherently “legislative,” then it must be the nature of the legal interest offered as an occasion for invoking otherwise appropriate judicial relief. But I do not think that the fact that the interest is protected by the Constitution rather than statute or common law justifies the assertion that federal courts are powerless to grant damages in the absence of explicit congressional action authorizing the remedy. Initially, I note'that it would be at least anomalous to conclude that the federal judiciary— while competent to choose among the range of traditional judicial remedies to implement statutory and common-law policies, and even to generate substantive rules governing primary behavior in furtherance of broadly formulated policies articulated by statute or Constitution, see Textile Workers v. Lincoln Mills, 353 U. S. 448 (1957); United States v. Standard Oil Co., 332 U. S. 301, 304-311 (1947); Clearfield Trust Co. v. United States, 318 U. S. 363 (1943) — is powerless to accord a damages *404 remedy to vindicate social policies which, by virtue of their inclusion in the Constitution, are aimed predominantly at restraining the Government as an instrument of the popular will.
More importantly, the presumed availability of federal equitable relief against threatened invasions of constitutional interests appears entirely to negate the contention that the status of an interest as constitutionally protected divests federal courts of the power to grant damages absent express congressional authorization. Congress provided specially for the exercise of equitable remedial powers by federal courts, see Act of May 8, 1792, § 2, 1 Stat. 276; C. Wright, Law of Federal Courts 257 (2d ed., 1970), in part because of the limited availability of equitable remedies in state courts in the early days of the Republic. See Guaranty Trust Co. v. York, 326 U. S. 99, 104-105 (1945). And this Court's decisions make clear that, at least absent congressional restrictions, the scope of equitable remedial discretion is to be determined according to the distinctive- historical traditions of equity as an institution, Holmberg v. Armbrecht, 327 U. S. 392, 395-396 (1946); Sprague v. Ticonic National Bank, 307 U. S. 161, 165-166 (1939). The reach of a federal district court’s “inherent equitable powers,” Textile Workers v. Lincoln Mills, 353 U. S. 448, 460 (Burton, J., concurring in result), is broad indeed, e. g., Swann v. Charlotte-Mecklenburg Board of Education, 401 U. S. 1 (1971); nonetheless, the federal judiciary is nqt empowered to grant equitable relief in the absence of congressional action extending jurisdiction over the subject matter of the suit. See Textile Workers v. Lincoln Mills, supra, at 460 (Burton, J., concurring in result) ; Katz, 117 U. Pa. L. Rev., at 43.[5]
*405 If explicit congre? :onal authorization is an absolute prerequisite to the power of a federal court to accord compensatory relief regardless of the necessity or appropriateness of damages as a remedy simply because! of the status of a legal interest as constitutionally protected, .then it seems to me that explicit congressional authorization is similarly prerequisite to the exercise of equitable remedial discretion in favor of constitutionally protected interests. Conversely, if a general grant of jurisdiction to the federal courts by Congress is thought adequate to empower a federal court to grant equitable relief for all areas of subject-matter jurisdiction enumerated therein, see 28 U. S. C. § 1331 (a), then it seems to me that the same statute is sufficient to empower a federal court to grant a traditional remedy at law.[6] Of course, the special historical traditions governing the federal equity system, see Sprague v. Ticonic National Bank, 307 U. S. 161 *406 (1939), might still bear on the comparative appropriateness of granting equitable relief as opposed to money-damages. . That possibility, however, relates, not to whether the federal courts have the power to afford one type of remedy as opposed to the other, but rather to the criteria which should govern the exercise of our power. To that question, I now pass.
Ill
The major thrust of the Government’s position is that, where Congress has not expressly authorized a particular remedy, a federal court should exercise its power to accord a traditional form of judicial relief at the behest of a litigant, who claims a constitutionally protected interest has been invaded, only where the remedy is “essential,” or “indispensable for vindicating constitutional rights.” Brief for Respondents 19, 24. While this “essentiality” test is most clearly articulated with respect to damages remedies, apparently the Government believes the same test explains the exercise of equitable remedial powers. Id., at 17-18. It is argued that historically the Court has rarely exercised the power to accord such relief in the absence of an express congressional authorization and that “[i]f Congress.had thought that federal officers should be subject to a law different than state law, it would have had no difficulty in saying so, as it did with respect to state officers . . . .” Id., at 20-21 see 42 U. S. C. § 1983. Although conceding that the standard of determining whether a damage remedy should be utilized to effectuate statutory policies is one of “necessity” or “appropriateness,” see J. I. Case Co. v. Borak, 377 U. S. 426, 432 (1964); United States v. Standard Oil Co., 332 U. S. 301, 307 (1947), the Government contends that questions concerning congressional discretion to modify judicial remedies relating to constitutionally protected interests warrant a more stringent constraint on *407 the exercise of judicial power with respect to this class of legally protected interests. Brief for. Respondents 21-22.
These arguments for a more stringent test to govern the grant of damages in constitutional cases[7] seem to be adequately answered by the point that the judiciary has a particular responsibility to assure the vindication of constitutional interests such as those embraced by the Fourth Amendment. To be sure, “it must be remembered that legislatures are ultimate guardians of the liberties and welfare of the people in quite as great a degree as the courts.” Missouri, Kansas & Texas R. Co. v. May, 194 U. S. 267, 270 (1904). But it must also be.recog-, nized that the Bill of Rights is particularly intended to vindicate the interests of the individual in the face of the popular will as expressed in legislative majorities; at the very least, it strikes me as no more appropriate to await express congressional authorization of traditional judicial relief with regard to these legal interests than with respect'to interests protected by federal statutes.
The question then, is, as I see it, whether compensatory relief is “necessary” or “appropriate” to the vindication of the interest asserted. Cf. J. I. Case Co. v. Borak, supra, at 432; United States v. Standard Oil Co., supra, at 307; Hill, Constitutional Remedies, 69 Col. L. Rev. 1109, 1155 (1969); Katz, 117 U. Pa. L. Rev., at 72. . In resolving that question, it seems to me that the range of policy considerations we may take into account is at least as broad as the range of those a legislature would consider with respect to an express statutory authorization of a traditional remedy. In this regard I agree with the Court that the appropriateness of according Bivens *408 compensatory relief does not turn simply on the deterrent effect liability will have on .federal official conduct.[8] Damages as a traditional form of compensation for invasion of a legally protected interest may be entirely appropriate even if no substantial deterrent effects on future official lawlessness might be thought to result. Bivens, after all, has invoked judicial processes claiming entitlement to compensation for injuries resulting from allegedly lawless official behavior, if those injuries are properly compensable in money damages. I do not think a court of law — vested with the power to accord a remedy — should deny him his relief simply because he cannot show that-future lawless conduct will thereby be deterred.
And I think it is clear that Bivens advances a claim of the sort that, if proved, would be properly compensable in damages. The personal interests protected by the Fourth Amendment are those we attempt to capture by the notion of “privacy”; while the Court today properly points out that the type of harm which officials can inflict when they invade protected zones of an individual’s life *409 are different from the types of harm private citizens inflict on one another, the experience of Judges in dealing with private trespass and false imprisonment claims supports the conclusion that courts of law are capable of making the types of judgment concerning causation and magnitude of injury necessary to accord meaningful compensation for invasion of Fourth Amendment rights.[9]
On the other hand, the limitations on state remedies for violation of common-law rights by private citizens argue in favor of a federal damages remedy. The injuries inflicted by officials acting uftder color of law, while no less compensable in damages than those inflicted by private parties, are substantially different in kind, as the Court’s opinion today discusses in detail. See Monroe v. Pape, 365 U. S. 167, 195 (1961) (Hablan, J., concurring). It seems to me entirely proper that these injuries be compensable according'to uniform rules of federal law, especially in light of the very large element of federal law which must in any event control the scope of official defenses to liability. See Wheeldin v. Wheeler, 373 U. S. 647, 652 (1963); Monroe v. Pape, supra, at 194-195 (Harlan, J., concurring); Howard v. Lyons, 360 U. S. 593 (1959). Certainly, there is very little to be gained from the standpoint of federalism by preserving different rules of liability for federal officers dependent on the State where the injury occurs. Cf. United States v. Standard Oil Co., 332 U. S. 301, 305-311 (1947).
Putting aside the desirability of leaving the problem of federal official liability to the vagaries of common-law actions, it is apparent that some form of damages is the only possible remedy , for someone in Bivens’ alleged *410 position. It will be a rare case indeed in which an individual in Bivens’ position will be able to obviate the harm by securing injunctive relief from any court. However desirable a direct remedy against the Government might be as a substitute for individual official liability, the sovereign still remains immune to suit. Finally, assuming Bivens’ innocence of the crime charged, the “exclusionary rule” is simply irrelevant. For people in Bivens’ shoes, it is damages or nothing.
The only substantial policy consideration advanced against recognition of a federal cause of action for violation of Fourth Amendment rights by federal officials is the incremental expenditure of judicial resources that will be necessitated by this class of litigation. There is, however, something ultimately self-defeating about this argument. For if, as the Government contends, damages will rarely be realized by plaintiffs in these cases because of jury hostility, the limited resources of the official concerned, etc., then I am not ready to assume that there will be a significant increase in the expenditure of judicial resources on these claims. Few responsible lawyers and plaintiffs are likely to choose the course of litigation if the statistical chances of success are truly de minimis. And I simply cannot agree with my Brother Black that the possibility of “frivolous” claims — if defined simply as claims .with no legal merit — warrants closing the courthouse doors to people in Bivens’ situation. There are other ways, short of that, of coping with frivolous lawsuits.
On the other hand, if — as I believe is the case with respect, at least, to the most flagrant abuses of official power — damages to some degree will be available when the option of litigation is chosen, then the question appears to be how Fourth Amendment interests rank on a scale of social values compared with, for example, the interests of stockholders defrauded by misleading proxies. *411 See J. I. Case Co. v. Borak, supra. Judicial resources, I am well aware, are increasingly scarce these days. -Nonetheless, .when we automatically close the courthouse door solely on this basis, we implicitly express a value judgment on the comparative importance of classes of legally protected interests. And current limitations upon the effective functioning of the courts arising from budgetary inadequacies should not be permitted to stand in the way of the recognition of otherwise sound constitutional principles.
Of course, for a variety of reasons, the remedy may not often be sought. See generally Foote, Tort Remedies for Police Violations of Individual Rights, 39 Minn. L. Rev. 493 (1955). And the countervailing interests in efficient law enforcement of course argue for a protective zone with respect to many types of Fourth Amendment violations. Cf. Barr v. Matteo, 360 U. S. 564 (1959) (opinion of Harlan, J.). But, while I express no view on the immunity defense offered in the instant case, I deem it proper to venture the thought that at the very least such a remedy would be available for the most flagrant and patently unjustified sorts of police conduct. Although litigants may not often choose to seek relief, it is important, in a civilized society, that the judicial branch of the Nation’s government stand ready to afford a remedy in these circumstances. It goes without saying that I intimate no view on the merits of petitioner’s underlying claim.
For these reasons, I concur in the judgment of the Court.

 Petitioner also asserted federal jurisdiction under 42 U. S. C. § 1983 and 28 U. S. C. § 1343 (3), and 28 U. S. C. § 1343 (4). Neither will support federal jurisdiction over the claim. See Bivens v. Six Unknown Named Agents, 409 F. 2d 718, 720 n. 1 (CA2 1969).

 See n. 3, infra.

 The Government appears not quite ready to concede this point. Certain points in the Government’s argument seem to suggest that the “state-created right — federal defense” model reaches’not only the question of the power to accord a federal damages remedy, but also the claim to any judicial remedy in any court. Thus, we are pointed to Lasson’s observation concerning Madison's version of the Fourth . Amendment as introduced into the House:
. “The observation may be made that the language of the proposal did not purport to create the right to be secure from unreasonable *401 search and seizures but merely stated it as a right which already existed.”
N. Lasson, History and Development of the Fourth Amendment to the United States Constitution 100 n. 77 (1937), quoted in Brief for Respondents 11 n. 7. And, on the problem of federal eqúitable vindication of constitutional rights without regard to the presence of a “state-created right,” see Hart, The Relations Between State and Federal Law, 54 Col. L. Rev. 489, 523-524 (1954), quoted in Brief for Respondents 17.
On this point, the choice of phraseology in the Fourth Amend- • ment itself is singularly unpersuasive. The leading argument against a “Bill of Rights” was the fear that individual liberties not specified expressly would be taken as excluded. See generally, Lasson, supra, at 79-105. This circumstance alone might well explain why the authors of the Bill of Rights, would opt for language which presumes the existence of a fundamental interest in liberty, albeit originally derived from the common law. See Entick v. Carrington, 19 How. St. Tr. 1029, 95 Eng. Rep. 807 (1765).
In truth, the legislative record as a whole behind the Bill of Rights is silent on the rather refined doctrinal question whether the framers considered the rights therein enumerated as dependent in the first instance on the decision of a State to accord legal status to the personal interests at stake. That is understandable since the Government itself points out that general federal-question jurisdiction was not extended to the federal district courts until 1875. Act of March 3, 1875, § 1, 18 Stat. 470. The most that can be drawn from this historical fact is that the authors of the Bill of Rights assumed the adequacy of common-law remedies to-vindicate the federally protected interest. One must first combine this assumption with contemporary modes of jurisprudential thought which appeared to link “rights” and “remedies” in a 1:1 correlation, cf. Marbury v. Madison, 1 Cranch 137, 163 (1803), before reaching the conclusion that the framers are to be understood today as having created no federally protected interests. And, of course, that would simply require the conclusion that federal equitable relief would not lie to protect those interests guarded by the Fourth Amendment.
Professor Hart’s observations concerning the “imperceptible steps” *402 between In re Ayers, 123 U. S. 443 (1887), and Ex parte Young, 209 U. S. 123 (1908), see Hart, supra, fail to persuade me that the source of the legal interest asserted here is other than the Federal Constitution itself. In re Ayers concerned the precise question whether the Eleventh Amendment barred suit in a federal court for an injunction compelling a state officer to perform a contract to which the State was a party. Having concluded that the suit was inescapably a suit against the State under the Eleventh Amendment, the Court spoke of the presence of state-created rights as a distinguishing factor supporting the exercise of federal jurisdiction in other contract clause cases. The. absence of a state-created right in In re Ayers served to distinguish that case from the perspective of the State’s immunity to suit; Ayers simply does not speak to the analytically distinct question whether the Constitution is in the relevant sense a source of legal protection for the “rights” enumerated therein.

 The Borák case is an especially clear example of the exercise of federal judicial power to accord damages as an appropriate remedy in the absence of any express statutory authorization of a ’federal *403 cause of action. There we “implied” — from what can only be characterized as an “exclusively procedural provision” affording access to a federal forum, cf. Textile Workers v. Lincoln Mills, 353 U. S. 448, 462-463 (1957) (Frankfurter, J., dissenting) — a private cause of action for damages for violation of § 14 (a) of the Securities Exchange Act of 1934, 48 Stat. 895, 15 U. S. C. § 78n (a). See § 27, 48 Stat. 902, 15 U. S. C. § 78aa. We did so in an area where federal regulation has been singularly comprehensive and elaborate administrative enforcement machinery had been provided. The exercise of judicial power involved in Borak simply cannot be justified in terms of statutory construction, see Hill, Constitutional Remedies, 69 Col. L. Rev. 1109, 1120-1121 (1969); nor did the Borak Court purport to do so. See Borak, supra, at 432-434. The notion of “implying” a remedy, therefore, as applied to cases like Borak, can only refer to a process whereby the federal judiciary exercises a choice among traditionally available judicial remedies according to reasons related to the substantive social policy embodied in an act ■ of positive law. See ibid., and Bell v. Hood, supra, at 684.

 With regard to a court’s authority to grant'an equitable remedy, the line between “subject matter” jurisdiction and remedial powers-has undoubtedly been obscured by the fact that historically the *405 “system of .equity ‘derived its doctrines, as well as its powers, from its mode of giving relief.’ ” See Guaranty Trust Co. v. York, supra, at. 105, quoting C. Langdell, Summary of Equity Pleading xxvii (1877). Perhaps this fact alone accounts for the suggestion sometimes made that a court’s power to enjoin invasion of constitutionally protected interests derives directly from the Constitution. See Bell v. Hood, 71 F. Supp. 813, 819 (SD Cal. 1947).

 Chief Judge Lumbard’s opinion for the Court of Appeals in the instant case is, as I have noted, in accord with this conclusion:
“Thus, even if the Constitution itself does not give rise to an inherent injunctive power to prevent its violation by governmental officials there are strong reasons for inferring the existence of this power under any general grant of jurisdiction to the federal courts by Congress.” 409 F. 2d, at 723.
The description of the remedy as “inferred” cannot, of course, be intended to assimilate the judicial decision to accord such , a remedy to any process of statutory construction. Rather, as with the cases concerning remedies, implied from statutory schemes, see n. 4, supra, the description of the remedy as “inferred” can only bear on the reasons offered to explain a judicial decision to accord or not to accord a particular remedy.

 I express no view on the Government’s suggestion that congressional authority to simply discard the remedy the Court today authorizes might be in doubt; nor do I understand the Court’s opinion today to express any view on that particular question.

 And I think it follows from this point that today’s decision has little, if indeed any, bearing on the question whether a federal court may properly devise remedies — other than traditionally available forms of judicial relief — for- the purpose of enforcing substantive social policies embodied in constitutional or statutory policies. Compare today’s decision with Mapp v. Ohio, 367 U. S. 643 (1961), and Weeks v. United States, 232 U. S. 383 (1914). The~Court today simply recognizes what has long been implicit in. our decisions concerning equitable relief and remedies implied from statutory schemes; i.'e., that a court of law vested with jurisdiction over the subject matter of a suit has the power — and therefore the duty — to make principled choices among traditional judicial remedies. Whether special prophylactic measures — which at least arguably the exclusionary rule exemplifies, see Hill, The Bill of Rights and the Supervisory Power, 69 Col. L. Rev. 181, 182-185 (1969) — are supportable on grounds other than a court’s competence to select among traditional j idicial remedies to make good the wrong done, cf. Bell v. Hood, supra, at 684, is a separate question.

 The same, of course, may not be true with respect to other types of constitutionally protected interests, and therefore the appropriateness of money damages may w;ell vary with the nature of the personal interest asserted. See Monroe v. Pape, 365 U. S. 167. 196 n. 5 (Harlan, J., concurring).